NORTHERN INSURANCE COMPANY OF NEW YORK, A CORPORATION, v. TRADERS GATE CITY NATIONAL BANK OF KANSAS CITY, MISSOURI, A CORPORATION.—186 S. W. (2d) 491.

Kansas City Court of Appeals. January 22, 1945.

*Jeter & Earhart* for appellant.

*Harding, Murphy* and *Tucker* for respondent.

DEW, J.—This is an action in equity brought by the appellant to recover money claimed by it, deposited in respondent bank by the

John P. Tillhof Company, a corporation. The balance of said amount had been set off by respondent on a matured note held by it signed by John P. Tillhof Company and by John P. Tillhof. The trial court found the issues for the defendant (respondent) and rendered judgment accordingly. Plaintiff appealed to this court.

The appellant and the respondent were respectively plaintiff and defendant in the trial below, and for convenience, will hereinafter be referred to by their party designations below.

The essential facts in evidence are, in substance, as follows: The plaintiff is a corporation, organized in the state of New York, and engaged in the insurance business in Kansas City, Missouri, and elsewhere; defendant is a corporation, carrying on a banking business in said city; John P. Tillhof Company is a corporation in Kansas City, Missouri, in the business of writing insurance for several insurance companies, and selling real estate, managing real estate properties, collecting rentals and interest for various clients. John P. Tillhof was practically the owner of the John P. Tillhof Company; it had no other bank account and Mr. Tillhof had no separate bank account of his own and merged his private and personal banking transactions with those of this corporation.

Among the clients of the Tillhof Company was the plaintiff, for which the Tillhof Company was a licensed agent in Kansas City. As such agent the Tillhof Company was authorized to write policies of insurance for the plaintiff, to collect premiums therefor, to hold the same for stated periods for accounting and remittances, and to make monthly reports thereof. It was the custom for such agents to deposit such collections in their individual bank accounts and to remit same by check to their principals. Between September 21, 1938, and October 17, 1938, the Tillhof Company collected premiums on appellant's policies in the total sum of $1997.78, which sums had been deposited in the defendant bank in the account of said Tillhof Company. John P. Tillhof died on October 17, 1938. On that same day two notes, payable to and held by the defendant bank, matured, one for $2400.00, dated July 18, 1938, and one for $3450.00, dated August 22, 1938, both being signed by the John P. Tillhof Company and by John P. Tillhof. The notes drew 8 percent interest per annum from maturity, were further secured by a mortgage not for $6500.00, belonging to John P. Tillhof, and each provided, among other terms, that the makers thereby gave to said bank a lien for the payment of all liabilities under said notes on all notes, drafts, bills receivable, monies and other property of the signers left or which shall thereafter be left in the possession or custody of said bank for any purpose, and upon any present or future balance of deposit in said bank, granting authority to said bank at any time to apply such deposit or accounts of the signers on the books of said bank in whole, or in part, to the payment of any or all of said liabilities, including the notes in question.

On October 17, 1938, there was a balance in the said account of John P. Tillhof Company of $1746.59. The above notes of the depositor John P. Tillhof Company having on that date matured, defendant bank applied the latter's said balance of account to the said $2400.00 note, the balance of said notes being later liquidated by foreclosure of the collateral mortgage security belonging to the heirs of Mr. Tillhof.

The deposit slips used by Tillhof Company over the years in question and up to the date of Mr. Tillhof's death were made in the usual way by the John P. Tillhof Company, in some instances containing no memoranda as to identification of the monies being deposited; in other instances certain initials were shown opposite the amounts, and in some instances individual names were shown, and frequently the initials "J. P. T.", being the initials of Mr. Tillhof, were written opposite some of the items; but such deposit slips did not purport to show, other than to one familiar with the books and accounts and detailed transactions of the Tillhof Company, the identification of any of the funds so deposited. The commissions of the Tillhof Company were likewise deposited in its said account and on several occasions the defendant, or its auxiliary holding company, purchased insurance policies of the plaintiff company through the Tillhof Company, the premiums for which were deposited in the Tillhof Company bank account. John P. Tillhof was the person authorized to sign his company's checks on said account.

The plaintiff and the John P. Tillhof Company on August 20, 1937, entered into an agreement wherein the John P. Tillhof Company was referred to as "agent" and the plaintiff as "company", in which authority was granted to the agent to receive and accept proposals for insurance contracts for said insurance company in Kansas City, Missouri, and vicinity, and authority was given to the agent to collect, receive and receipt for premiums on insurance so written, providing for agent's commissions on various classifications of insurance and, among other things, to render monthly account of monies due the company, and requiring the agent to remit to the company the amounts due it within sixty days after the end of the month for which account thereof was rendered. It was provided in said contract that the company would not be responsible for agency expenses such as rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, etc.

The checks of the John P. Tillhof Company to the order of the plaintiff against the said account of the John P. Tillhof Company in the defendant bank were cleared over the years through said bank in the regular course of its banking business, and practically each month between January, 1938, and October, 1938, inclusive.

Between September 22, 1938, and October 17, 1938, inclusive, deposits were made by the John P. Tillhof Company in its said account

in defendant bank, which deposits contained monies collected for the plaintiff along with other funds, and leaving bank balances, after check clearances, respectively, as follows:

| Date 1938 | Amount of Deposit | Amount of collections for plaintiff included | Other funds included | Bank Balance |
|---|---|---|---|---|
| Sept. 22 | $1379.05 | $643.19 | $735.86 | $2324.87 |
| Sept. 24 | 243.31 | 27.56 | 215.75 | 1896.70 |
| Sept. 26 | 72.60 | 72.60 | | 1903.50 |
| Sept. 28 | 191.38 | 116.87 | 74.51 | 1717.15 |
| Sept. 29 | 125.50 | 79.00 | 46.50 | 1989.44 |
| Oct. 1 | 383.00 | 19.75 | 363.25 | 1817.84 |
| Oct. 4 | 522.78 | 34.80 | 487.98 | 1848.17 |
| Oct. 5 | 541.69 | 46.50 | 495.19 | 1870.82 |
| Oct. 5 | 50.00 | 4.00 | 46.00 | 1724.61 |
| Oct. 10 | 78.69 | 18.69 | 60.00 | 1545.02 |
| Oct. 11 | 140.82 | 62.34 | 78.48 | 1676.84 |
| Oct. 11 | 153.54 | 120.95 | 32.59 | 1554.09 |
| Oct. 13 | 670.70 | 523.43 | 147.27 | 1832.97 |
| Oct. 14 | 185.42 | 40.20 | 145.22 | 1756.46 |
| Oct. 15 | 140.31 | 73.00 | 67.31 | 1757.00 |

During the above period the bank statements in evidence showed that the Tillhof Company drew 114 checks against said account, the payees and nature of which are not shown.

The bank honored a few checks against the said last balance so that on October 17th, the final balance was $1746.59. The total of the insurance premiums on plaintiff's policies deposited on the above dates was $1997.78. The commissions due the John P. Tillhof Company were included in the plaintiff's monies so deposited.

Plaintiff claims $1396.96 of the said balance as representing unremitted net premium collections held in trust by said John P. Tillhof Company on said date.

During the period of the above deposits, the Tillhof Company collected and deposited $1362.47 in rents, and $642.32 interest for clients. The plaintiff had never authorized the John P. Tillhof Company to use the plaintiff's money for the John P. Tillhof Company's private business. After defendant had applied the deposit to the note due from the John P. Tillhof Company, there were no funds in the bank account or in possesion of the John P. Tillhof Company to pay the obligation owing to the plaintiff. The John P. Tillhof Company borrowed no money from defendant between September 21, 1938, and October 17, 1938.

The John P. Tillhof Company represented other insurance companies than the plaintiff and collected premiums on policies of the other companies; also rentals and fees for services in property management, and in the general real estate business, and interest on mortgages for other clients, depositing such collections in said account of John P. Tillhof Company in defendant bank, and disbursements were made out of said account to the plaintiff for net premiums due it, to real estate owners for net rentals due them for repairs on clients' properties, for personal funds to Mr. Tillhof, and in payment of clerical help, including payrolls, office expenses, etc.

Over a period of years previous to the time in question, the John P. Tillhof Company made loans from the said bank and executed notes therefor from time to time, and as the same matured they were frequently renewed, either for the same amount, or with some reduction, and upon the dates of renewals the company had balances in its said account sometimes in excess of the note being renewed, and sometimes less. In the year in question, 1938, the company note of $550.00 matured February 23, when the company had a balance of $506.77. The note was renewed. On April 20, the company note for $2450.00 was reduced $50.00 and renewed. The company at the time had a balance of $615.24. On May 23, the company note for $550.00 again matured and it was again renewed. The company balance was then $452.49. In July, the company note for $2450.00 matured and $50.00 was paid on the same and the same renewed. The company then had a balance on account of $362.59.

Two financial statements of the Tillhof Company furnished the bank in December, 1934, and December, 1935, showed the company then owing defendant bank between $9000.00 and $10,000.00; the bills payable between $8000.00 and $11,000.00; deposits between $1500.00 and $2000.00; bills receivable, $4750.00; accounts receivable between $11,000.00 and $14,000.00. In the statement of December, 1935, under a column of liabilities, and designated as "Deposits of money with us", appears "Int. Coll. $419.26—Rents $1172.40—$1591.66". On both statements appeared the words "$4750.00 note pledged as collateral—Traders Bank". In both statements the indebtedness to the Traders Bank is shown as "secured". No other financial statements of the company could be found in the record of the bank.

Mr. Planck of the defendant bank, a witness for the plaintiff, testified that he never at any time had any knowledge concerning any trust character of the account of John P. Tillhof Company, nor of the nature of the funds therein deposited, nor was there ever any conversation, to his knowledge, in the bank explaining the nature of such account; that he knew in a general way that the Tillhof Company operated a real estate business, selling and managing real estate, and sold insurance for various companies; that he had never seen the deposit slips of the company until produced at the trial; that the com-

pany deposits were handled in the usual, ordinary course of business; that when anyone makes such deposit slip and goes to the cage and makes a deposit, the same would go through the books without any further knowledge of the bank; that he understood that the company was agent for the Northern Insurance Company of New York; that on occasions the Gate City Realty Company, a subsidiary of the bank, had purchased insurance through the John P. Tillhof Company in that insurance company, the premiums for which were paid, but as to what became of the money after it was paid to the Tillhof Company he had no knowledge, but from the checks introduced in evidence at trial, the witness stated that he would say they were deposited in the company's account in defendant bank; that it was the custom for the discount committee of the bank, when depositor's notes were about to mature, to discuss the question of whether the same should be renewed, or partially paid or wholly paid; that where an account was kept as the John P. Tillhof Company account was, the bank would consider the account pledged to the bank; that he would not know that a depositor, if an insurance agent, owed the insurance company for premium. Mr. Planck further testified that he never knew up to the time of the closing of the bank account of the John P. Tillhof Company whether it had or had not paid the Northern Insurance Company all it owed to that company, if anything.

An officer of the John P. Tillhof Company, also a witness for plaintiff, testified that out of the collections made and deposited over the period shown in evidence, the balance due to the Northern Insurance Company by the John P. Tillhof Company was $1396.96; that the collections of the premiums had been deposited by the John P. Tillhof Company intact and the commissions due the John P. Tillhof Company were included in such deposits.

One witness for the plaintiff testified that after the death of Mr. Tillhof, he, in behalf of the John P. Tillhof Company, called on the defendant bank to inquire if the money in question could be released by the bank, and that the attorney for the bank prepared an agreement, setting upon the claims of the bank and of the plaintiff, and providing for rescision of the bank's action in applying said account to said company's notes, provided that the agreement be consented to and signed by the residuary legatees interested in the real estate described in the Deed of Trust also securing said not, and that said agreement was signed by such heirs, but was never executed by the bank. This instrument was, over the objection of the defendant bank, introduced in evidence, and it was explained that there was a foreclosure of the Deed of Trust securing said note, the proceeds of which fully paid the balance of the notes without any payment being made by the heirs of John P. Tillhof.

The theory of plaintiff's action is that the funds in the account of John P. Tillhof Company in defendant bank on October 17, 1938,

were trust funds belonging to plaintiff, to the extent of the total net amount of premiums deposited and unremitted, and that the defendant bank knew the same were trust funds of the plaintiff, or had sufficient information respecting the same as to put it on inquiry to ascertain such trust character of the said funds.

Under the evidence it is clear that the premiums collected by the John P. Tillhof Company as agent for plaintiff, except only so much thereof as represented an agent's commission thereon, belonged to the plaintiff. The Tillhof Company was permitted by the plaintiff to collect the premiums due the plaintiff, retain them until agreed dates of accounting, to deposit same in its own general bank account, to control said account, and to remit therefrom the net premiums to the plaintiff. After collection and while deposited in the agent's general, private bank account, those net collections were trust funds, as between plaintiff and the John P. Tillhof Company. The relationship of the John P. Tillhof Company and the plaintiff in reference to said net premiums so collected and so held, deposited, and controlled, was that of trustee and *cestui que trust,* respectively, and not merely that of creditor and debtor. Although under the agency agreement the John P. Tillhof Company was allowed sixty days to remit premiums reported receivable in a given month, and although it was plaintiff's custom and the custom generally among insurance companies to permit the agent to deposit such collections in the agent's individual bank account and remit for same therefrom, nevertheless, the trust character of such net premiums belonging to plaintiff remained the same, as between the plaintiff and the John P. Tillhof Company.

If there were any doubt of the applicability of that principle as between plaintiff and the Tillhof Company, Section 6018, Revised Statutes Missouri 1939, would create such trust relationship between them and fix the nature of the agent's liabilities accordingly. Part of said section reads as follows:

". . . Any person who shall be appointed, or who shall act as agent for any insurance company within this state, or who shall, as such agent, solicit applications, deliver policies or renewal receipts and collect premiums thereon, or who shall receive or collect moneys from any source or on any account whatsoever, as such agent, for any insurance company doing business in this state, such person shall be held responsible in a trust or fiduciary capacity to such company for any money so collected or received by him for such company. . . ."

But was the bank balance of the John P. Tillhof Company, in the hands of defendant bank and set off by defendant bank October 17, 1938, to apply on a note of that depositor due to said bank on that date, trust funds of the plaintiff as between the plaintiff and the defendant bank? If they were, the defendant bank had no right to set off the same on the note of the depositor. If they were not, the

defendant did have a right, under the terms of the note, to apply the balance of the depositor's account to depositor's matured note.

The rules of law on this vital question have grown out of the plain, practical necessities of commerce and banking operations. A bank lawfully receives deposits. The depositor controls the designation or name under which the account is carried. Such name may on its face disclose the trust nature of the account, or it may be merely the individual name of the depositor and imply nothing of the trust character of the funds intended to be deposited thereunder. The bank may lawfully lend to a depositor. It may take his note therefor and place the money lent to the depositor's account, if so desired. The bank may take security for the loan and the note may lawfully contain provisions for a lien on the account of the depositor in the lending bank as further security for the loan. In case of default, under the terms of such a note, the bank may lawfully appropriate the balance of the account to apply on the defaulted note, unless, under particular conditions existing, there are rights of others which, under the law, would prevail over the rights of the bank to the account of the borrower—depositor. In case others claim rights prior to those of the bank, the rule of law has been definitely established and is succinctly stated in Horigan Realty Company v. Bank, 273 S. W. 772, l. c. 775, as follows:

"It is also the established rule that the bank may apply a customer's deposit to the payment of the latter's overdue note, although the money may belong to another, unless the bank has knowledge that the money does not so belong."

Before the right of the plaintiff in the case at bar to the balance of the account of John P. Tillhof Company in defendant's possession can prevail over the lien of the defendant bank thereon, the trust nature of the bank balance must have been known to the bank, or it must have had sufficient knowledge of facts relating to the interests of others in the account as to put the bank on inquiry to ascertain the trust character of the account. The knowledge of the bank may be shown by direct or indirect evidence.

"The decided weight of authority is to the effect that where the bank in which funds in which third persons have an interest are deposited in the individual name of the depositor has neither actual knowledge nor notice of facts sufficient to put it upon inquiry as to the true character of the deposit, it may apply the deposit to the individual debt of the depositor." [7 Am. Jur. page 463, Sec. 639.]

"The general rule under which a bank may, in dealings with its depositor, treat as his individual property deposited by him, does not apply when the bank has knowledge that money so deposited is held by the depositor in a fiduciary capacity, and bank deposits impressed with a trust may not be set off against the individual debt of the trustee and depositor to the bank, not even where the bank

lacks actual knowledge of the trust and has merely notice of facts which should put it on inquiry, an attempted appropriation passing no title to the bank, although where the claim of a trust is not substantiated by the facts, and the deposit is shown to be a mere general one, the bank may exercise its right of set-off, as where there is no notice to the bank of the trust character of the deposit. The circumstance that moneys belonging to the depositor individually were mingled in one account with moneys held in a fiduciary capacity does not entitle the bank to apply the trust funds to the private debt of the depositor''. [9 C. J. S., page 631, Sec. 304.]

What is the *direct* evidence as to the defendant bank's *actual* knowledge of the trust character of the bank balance in question? The plaintiff's witness, Mrs. Lake, vice-president of John P. Tillhof Company, testified, in part, as follows:

''Q. And in the making of deposit slips—I just hand you a handful of deposit slips and ask you if those are original deposit slips made by the John P. Tillhof Company in the Traders Bank— and state whether or not the general practice was followed as is suggested and indicated by the way these deposit slips are made out?

''A. Yes, sir.

''Q. The only knowledge and information conveyed to the bank by the deposit slips or any other way was just as is noted on them? A. That is right.

''Q. At no time was there any indication on any of the deposit slips used in depositing funds in the Traders Gate City Bank that the money represented by the deposits represented premiums collected on the Northern Insurance Company policy, was there?

''A. No, sir.

''Q. So from the deposit slips while there are some names opposite some of the amounts no one not knowing whether there was an insurance policy or not would know whether it was a rent remittance or whether it was a remittance to some other company or the Northern Insurance Company or a commission on a real estate deal, That is right, isn't it? A. Yes. . . .

''Q. There is nothing as far as you know—it was suggested by Mr. Planck—look here—there is nothing to indicate from the deposit slip where you get a slip like that one (indicating) with no names on it at all—nothing at all to indicate that that came from any particular source? A. No.

''Q. The Northern Insurance Company or anybody else?

''A. No, that is right.''

Plaintiff's witness Mr. Planck, an officer of the defendant bank, who handled the Tillhof Company's various note extensions or renewals, testified in part as follows:

"Q. Just generally, Mr. Planck, did you ever at any time have any knowledge concerning any trust character of the deposit of John P. Tillhof Company?

"A. No, sir, I did not.

"Q. In other words has any conversation been made to the bank at all to your knowledge that explained the nature of any of the funds deposited in the bank?

"A. No. There never was any conversation in respect to that.

"Q. You have heard it already explained in evidence by Miss Lake, the manner in which the bank account was handled. Did you ever have any knowledge to the contrary? A. Never.

"Q. You did know in a general way that he operated a real esaate business?

"A. Yes.

"Q. Sold and managed real estate?

"A. Yes.

"Q. Also sold insurance in various companies?

"A. Yes, sir.

"Q. And as to the deposits that were made in the bank did you ever pay any particular attention to it.at all?

"A. 'I don't think I ever saw a deposit ticket until these were produced.

"Q. Were all deposits of the Tillhof Company in your bank handled in the usual ordinary course of dealings? A. Yes.

"Q. Where someone would make up the deposit slip, go to the receiving cage, make the deposit, and that would go through the books without any further knowledge of the bank?

"A. That is correct as far as my knowledge goes.

"Q. Did you ever at any time up to the time of the final closing of this bank account know whether or not the Tillhof Company had paid the Northern Insurance Company all they owed it then?

"A. No, sir, I did not.

"Q. You didn't know whether they were paid or not, did you?

"A. I did not."

There was no other *direct* evidence of defendant's *actual* knowledge of the trust. Such as there was, as above quoted, not only did not prove actual knowledge on the part of defendant, but was definitely to the contrary.

But, as stated, knowledge of a bank, actual or imputed, of the trust character of a deposit of one of its depositors can be shown by *indirect* evidence, or by showing information in the possession of the bank on the subject as would be sufficient to have put it on inquiry.

First, let us note what were the other facts in evidence on this question of which the defendant bank is *not* shown to have had any actual knowledge. No knowledge of the bank is shown of the following facts: the contract between plaintiff and the John P. Tillhof Com-

pany; the names or identity of the depositor's other clients such as insurance companies, real estate owners, mortgage holders, etc.; whether they claimed any interest in the account in the depositor's name; that any of the portions of the deposits on the dates shown represented premiums collected by the depositor for plaintiff; whether any of the remainder of said deposits belonged to others; the meaning of any of the memoranda shown on the company's deposit slips in evidence, as to the source or identification of the items of deposit; who were the payees in or the purposes of the multitude of checks drawn against the account by the depositor; that the John P. Tillhof Company owed plaintiff any amount on the date in question or at any other time; that plaintiff had or had not ever authorized the John P. Tillhof Company to use any of its premium money for John P. Tillhof Company's private use; that there were no other funds in the hands of John P. Tillhof Company with which to pay plaintiff any sum belonging to it; that the John P. Tillhof Company or John P. Tillhof had no other bank accounts; that it was the custom of the plaintiff and other insurance companies to permit their agents to collect premiums and deposit same in the agent's general, private account in banks and to remit the net amounts of same by checks on such accounts to their principals; that between September 21, 1938 and October 17, 1938, John P. Tillhof Company had collected and deposited a total of $1997.78 of plaintiff's premiums, nor any other amount, or between any other dates; that some of such deposits contained commissions due the John P. Tillhof Company, or how much, if any; that many of the withdrawals by the depositor were remittances to clients, or repairs to real estate, or office expenses and payrolls, or for the personal debts of John P. Tillhof, or for what other purposes checks were drawn on said account; that upon any date the balance of the account exceeded the balance due from the John P. Tillhof Company to the plaintiff; or what was done with the net premiums paid by the bank to John P. Tillhof Company for several policies of insurance purchased in the past years by defendant's holding company through said depositor.

It is clear from the above that to establish defendant's knowledge of the trust character of the account of the John P. Tillhof Company, actual or imputed, or a duty on the part of the defendant to make inquiry as to same, such knowledge or such duty, if any, must arise by reason of other facts in evidence, and must be shown to have been known to the bank.

The only material facts in evidence of which defendant is shown to have *actual* knowledge are: that John P. Tillhof Company for years had been and was at the time in question in the general real estate business, and that of property management, insurance and loans; that one of the company's clients was the plaintiff, several policies of which insurance company defendant had, over the years,

purchased through the depositor, the premiums for which were paid to the depositor; that the John P. Tillhof Company for many years had issued a multitude of checks against its account as is usual in active accounts in a city bank; that said deposits and checks thereon had been handled by the bank in the usual course of business; that deposit slips accompanied said deposits, credits were given in said account of such deposits, checks as drawn on same were duly charged, paid checks with statements were delivered to the depositor monthly in the usual manner; that John P. Tillhof signed the checks of the John P. Tillhof Company and sometimes purchased drafts at said bank, payable as directed by him, which drafts were paid for by said company checks signed by him; that over many years the John P. Tillhof Company had borrowed various amounts from defendant bank, making notes therefor with the added personal signature of John P. Tillhof as comaker; that such notes were sometimes renewed, sometimes reduced, and sometimes paid by other such notes; that at such times the balance of the John P. Tillhof Company would be small and sometimes substantial, sometimes more or less than the amount of the loan; that in December, 1935, the company owed the bank $9900.00, secured by pledged securities, had in its hands interest of $419.26, and rents of $1172.40, presumably payable to clients, and that it had other accounts payable at that time of $8697.96, as against accounts and bills receivable of $16,410.26, not counting good will, shown as $13,500.00, but including a $4750.00 note pledged to the defendant bank; that the note in question for $2400.00 was due October 17, 1938, was secured by the individual signature of John P. Tillhof and by pledge of a $6500.00 mortgage note belonging to him, in addition to the provision in said note for a lien on the balance of the bank account of said company; that John P. Tillhof Company had not borrowed any money of defendant bank between September 21, 1938, and October 17, 1938. It is upon those facts and those facts only, known to the bank, that its knowledge must be imputed that the balance of the bank account of John P. Tillhof Company contained trust funds belonging to the plaintiff, or the duty of said bank to inquire into such possible claim must be predicated. It must be borne in mind that the other facts in evidence, while pertinent to establish the trust as between the plaintiff and the John P. Tillhof Company, cannot be considered on the question of the bank's knowledge, actual or imputed, or of its said duty of inquiry, because such other facts were not shown to have been known to the bank.

We do not deem the above facts shown by the evidence as known to the bank to be sufficient to impute knowledge on the part of the bank of a trust character of the balance of the John P. Tillhof Company at the time in question, or sufficient to impose upon said bank the duty first to investigate or inquire as to any such trust claims

before exercising the express lien given by that depositor on said bank balance in the event of nonpayment of the depositor's note to the bank.

Appellant relies confidently upon the case of Brown, et al. v. Maguire's Real Estate Agency et al., 101 S. W. (2d) 41, and 121 S. W. (2d) 754. Plaintiff's counsel in their brief ably and earnestly argue the applicability of that case to the case at bar. Respondent contends that that case is radically different as to the vital facts, and maintains that it is no authority in this case, either as to the existence of the trust or on the question of the bank's knowledge and duty in the premises. We believe the Maguire case is applicable on the question of whether or not the bank account, or plaintiff's claimed portion thereof, was a trust fund as between the trustee (agent) and the *cestui que trust* (insurance company). As to the facts in the Maguire case as they pertain to the knowledge on the part of the bank of the trust character of the deposits in the bank account, or the duty of the bank to make inquiry, we feel it necessary here to review the essential facts in that case for comparison with those in the instant case.

The appeal in the Maguire case was to the St. Louis Court of Appeals, and on dissent and request of one judge thereof, was certified to the Supreme Court. We refer herein to both said decisions for the facts of that case. Both courts held the bank balance of the depositor therein to constitute a trust fund as between the depositor (agent) and clients, and both courts held that the bank had knowledge thereof, or sufficient information to put it on inquiry, thereby making said balance a trust fund as between the bank and the other parties. The Supreme Court differed with the St. Louis Court of Appeals in certain other respects not material herein.

Substantially, the facts in the Maguire case, *supra*, were that: there were two accounts in the defendant bank, one in the name of Maguire's Real Estate Agency, and another in the name of James H. Maguire's Real Estate Agency was a common law trust of which Mr. Maguire was sole owner, except as to one share in his wife's name. The Agency collected rentals on different properties for many clients and deposited them all in said Agency account, as was customary among real estate agencies in St. Louis. Among the clients of said Agency were the interveners Rutherford and other heirs of an estate, who owned a certain building in St. Louis, long under lease to the Middleton Theatre Company, which tenant was also a depositor of the defendant bank; that for many years, with "clock-like" regularity said tenant would draw a check every ninety days on its account in said bank for $4000.00 to the credit of the Maguire's Real Estate Agency for quarterly payment of annual rental on said building, and said checks would with like regularity be deposited in the account of Maguire's Real Estate Agency, whereupon checks would be drawn by Maguire's Real Estate Agency against said account to some of the

heirs, and drafts would be purchased on the Agency account, payable to certain nonresident parties interested in said rental collections. Mr. Maguire also drew against funds in said Agency account for his salary, office expenses, taxes on his residence, commissions deposited therein, and for whatever other purpose he saw fit. This practice had obtained for many years. As far back as 1929, the Agency owed the bank $8500.00, secured by trust deeds and notes as collateral. By 1931, these notes had been reduced to $5500.00 and thereafter reduced to $4000.00 in 1932, at which time the Agency hade a renewal note for the latter amount to the bank, after which time nothing had been paid thereon except interest. The vice-president of the bank stated:

"Every time the note matured I made demand of Mr. Maguire to reduce it. It matured three times in 1932 and I made three requests for reduction, to which he replied he had no money."

He further testified that upon each renewal, he would have before him a general average balance in said Agency account for four or five months prior; that he did not call Maguire's attention to the fact of there being a large balance at times; that he (witness) knew Maguire was in the general real estate business, that he collected rents from various people, and that all amounts were deposited to the credit of the Agency, made payable to the Agency; that the Agency drew checks against the account as it saw fit, but did not know that Maguire got the quarterly checks from the Middleton Theatre Company belonging to the Rutherford heirs.

On November 26, 1932, a judgment was rendered in the Circuit Court of St. Louis against said Maguire's Real Estate Agency and James H. Maguire for $4341.36; execution thereon was issued and on January 4, 1933, the bank in question was garnished; that thereupon the bank "immediately initiated an investigation of its records to determine what assets of the defendant were in its possession. This investigation contained through January 5, 1933. By this investigation it was ascertained that on January 4, 1933, defendant Maguire's Real Estate Agency had to its credit the sum of $93.65, and that defendant James H. Maguire had to his credit the sum of 40 cents". On January 5, 1933, the bank mailed a letter to the Maguire's Real Estate Agency, notifying the Agency of the garnishment, which letter did not reach the Agency until January 6th. In the meantime, however, on January 5th, not having received notice from the bank of said garnishment, or otherwise notified of it, the Agency deposited in its said account in the garnishee bank $4093.50, which included the regular quarterly $4000.00 rental check drawn by the Middleton Theatre Company on the garnishee bank, which latter check was payable to the Maguire's Real Estate Agency. The note of the Maguire's Real Estate Agency for $4000.00 held by the bank and endorsed by James H. Maguire was "payable on demand and if no demand be made, then on the first day of February, 1933", and attached to said note was an

agreement to the effect that in the event of the issuance of an attachment, garnishment, or execution, against the Agency, the note, at the option of the bank, would immediately mature and become forthwith due and payable, whereupon the bank should have a right to offset said note against any balance or bank deposit then on deposit with said bank to the credit of said Agency, and that the bank might apply such balance to the payment thereof. The bank, after holding this much augmented account under the order of garnishment, waited until the definite maturity of said note, to-wit: February 1, 1933, and on that date and by endorsement on the note, and without a return of the note, or the collateral held as security, it applied $4000.00 plus $20.00 interest, out of the account of the Maguire's Real Estate Agency, to the payment of said note. Thereafter Rutherford and the other said heirs intervened and filed claims to that portion of said account representing the $4000.00 rental check drawn by the Middleton Theatre Company in favor of the Maguire's Real Estate Agency for rent on the property owned by said claimants.

In reviewing the facts in the Maguire case and construing the same on the point of the bank's knowledge, the Supreme Court said, l. c. 758:

"Garnishee's vice-president, who supervised the Agency's loan, knew from periodical examination of its account in connection with the note renewals that its average daily balance was very small; that during 1932 it had no money to make payments on its note; but that at times there would be a large balance in its account; that the Agency 'collected rents from various people' for others and deposited all such checks in this account; and that it must have drawn checks thereon to make remittance of these funds. He may not have known that $4,000 quarterly payments from the Middleton Theatre Company were deposited regularly for the purpose of remittance to interpleaders (and the trial court so found), although the bank records would have disclosed upon investigation that drafts were regularly purchased to do so. Certainly the frequent investigations of the Agency's account for the purpose of loan renewals, as well as efforts to make collection, must have disclosed much information about the Agency's business and the usual amount of its own funds in this account. Information concerning the source of this deposit made on the day after garnishment, and composed mostly of the $4,000 check of the Theatre Company on its account with garnishee, was immediately available and this must have been disclosed by the investigation made. *The fact that this deposit was made after garnishment was, at that time, called to the attention of the vice-president and it was investigated at once by the accounting department. The set-off charge 'was put through February 1, 1933', and was for $4,000 principal and $20 interest, which was the total amount then due on the Agency's note. Surely*

*at that time garnishee knew of the source of these funds*". (Italics supplied.)

It will be seen that there are no such vital and charging facts in the instant case as distinguish the Maguire case. There the name of the account alone, Maguire's Real Estate Agency, suggested a probable fiduciary character, especially where the individual controlling it carried a separate account in his name alone in the same bank. The bank in that case upon the frequent occasions when the depositor's notes were renewed, had been repeatedly told by him that he "had no money to pay them", although the bank on each such occasion figured his account for the previous several months and calculated his daily average balance and made no point of the actual balance as shown on certain dates of substantial amounts, which included the quarterly collections of $4000.00 from another depositor. The note became seriously imperiled when a judgment was rendered against the depositor and his endorser for $4037.46. Over a month later the bank was garnished by the depositor's judgment creditor, disclosing only a nominal balance in the Agency account and a few cents in Maguire's personal account. Thereupon, for two days, after garnishment, the bank examined and studied the Agency account, which must have revealed, if not already known to the bank, the "clock-like regularity" of the $4000.00 rental and deposit thereof made every ninety days for many years, and the disbursements thereof. By using the mail method of notifying the depositor of the garnishment, mailing the notice on January 5th, the day after the garnishment, the bank did not inform the depositor of the garnishment until January 6th, the day after he had deposited in the Agency account another $4000.00 rental check from the Middleton Theatre Company is "clock-like regularity". This was called to the attention of the bank's vice-president. The bank then, itself protected against departure of the augmented balance from its possession by the same garnishment, held the funds for three weeks, during which it had every opportunity and every reason to investigate and to learn of the facts pertaining to the account, and on February 1, when the note definitely matured, appropriated the Agency's balance to offset its note. Not only was the bank in the Maguire case put upon inquiry, but after garnishment, as the Supreme Court said, "Surely at that time garnishee knew of the source of these funds."

About the only material facts in the instant case comparable to those in the Maguire case is that the bank knew that the John P. Tillhof Company was in the general business of real estate, loan and insurance business; that among its numerous clients was the plaintiff insurance company, and that various notes of the depositor had been extended. This has been held insufficient to put the bank upon inquiry. In the case of Union Stock Yards Bank v. Gillespie, 137 U. S. 411, l. c. 415, 11 S. Ct. 118, 119, 34 L. Ed. 724, in speaking of the bank's

knowledge of the nature of a cattle buyer's business in connection with the ownership of the factor's funds there in question, that court said:

"Rappel, Sons & Co. were in the commission business—known to the bank to be in that business. They were not buyers and sellers, but factors—agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and while not of itself notice, is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. We do not mean to be understood as implying that a bank receiving deposits from one whom it knows to be in the commission business receives every deposit in trust for any unknown principal. A bank is not sponsor for all its depositors, although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor."

That court then traced the failing business of the depositor, as reflected on the bank's books, its knowledge of the nature of the business of the depositor as consignees and selling agents, and referred to the bank's own letters to another bank as to the small amount of ready money kept in the depositor's business, and held the bank charged with actual or imputed knowledge of the trust ownership of the funds in question.

The determination of the trust character of a bank account as between the depositor and a claimed *cestui que trust* is based on different rules and considerations than is the determination of the effect of such a trust upon the rights of a creditor bank wherein the trust account of the depositor is lodged. Where, as in this case, actual knowledge of the bank is not shown, and imputed knowledge or duty to inquire are relied upon to establish a prior right of a claimed *cestui que trust* over that of the bank to an account previously pledged to the bank by the depositor's note, the element of reasonableness must be considered, not for the purpose of determining the equities in the case, but to determine if imputed knowledge is shown, or if the bank, under the evidence, was reasonably put upon inquiry. Having held here that actual knowledge on the part of the bank was not shown, and that such of the facts as were shown to have been in the bank's possession were not sufficient to impute knowledge of the trust char-

acter of the account, we conclude further that, upon the meager and general facts known to the bank as shown in evidence in this case, it cannot be said that the defendant bank was thereby charged with the duty to inquire as to such a claim as that of the plaintiff to part of the bank balance of the depositor John P. Tillhof Company.

If a busy city bank with such limited general knowledge of a depositor's business were so put upon inquiry as claimed, its facilities as a depository, conduit or channel through which businessmen and concerns carry on their usual financial interchanges, as in this case, could not safely be maintained, and such bank could seldom hazard the risk of extending credit to a depositor on the security of his bank account therein. A bank in most such cases could not safely credit to the account of a borrower money borrowed from the bank, where it would be commingled with depositor's other funds, lest, by reason of the bank's general knowledge of the nature of the depositor's business, the money loaned would be absorbed by the prior claim of some one to the whole account, under a trust unknown to the bank. Banking business and public convenience in the ordinary connection therewith would be greatly hampered and impeded.

Such considerations, of course, would not be pertinent under sufficient facts showing the bank's knowledge, actual or implied, or a duty to inquire. Absent such facts, such a rule would be so unreasonable and impracticable as to suggest its own fallacy.

The other points made by the appellants are disposed of in the foregoing opinion.

For the reasons stated, we believe the judgment of the trial court was correct and should be affirmed. It is so ordered. All concur.