VIC GERARD GOLF CARS,
INC., Plaintiff,

v.

CITIZEN'S NATIONAL BANK OF FAIR-
FIELD, James J. Entwisle, Jr., Jack De-
Palo, The Longest Drive, Inc., Defend-
ants.

Civ. A. No. B–77–74.

United States District Court,
D. Connecticut.

Nov. 16, 1981.

**238**

Neil P. Coughlan, Robert N. Greco, Peter Mear, Maurice T. FitzMaurice, Reid & Riege, Hartford, Conn., for plaintiff.

Augustus R. Southworth III, Gager, Henry & Narkis, Waterbury, Conn., for defendants Citizen's National Bank of Fairfield and James J. Entwisle, Jr.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

■ In this diversity action, Vic Gerard Golf Cars, Inc. ("Vic Gerard") seeks recov-

ery from the Citizen's National Bank ("Citizen's National") on the ground that the bank's set-off of funds held in an account of defendant The Longest Drive, Inc. ("Longest Drive") was improper because those funds belonged to Vic Gerard. Also named as defendants are James Entwisle, an Assistant Vice President of the bank, and Jack DePalo, the President of The Longest Drive, Inc.[1]

■ In its three-count complaint, Vic Gerard alleges that 1) Citizen's National wrongly set off funds that were being held in a special deposit; 2) Citizen's National fraudulently misrepresented to Vic Gerard that monies due Vic Gerard from Mr. DePalo would be paid and that Vic Gerard relied upon this representation; and 3) Mr. James Entwisle individually committed a fraud upon Vic Gerard.[2]

In response, Citizen's National and Mr. Entwisle deny the material allegations of the plaintiff's complaint, contend that the bank had the legal right to set off the funds in question, and affirmatively argue the defense of estoppel based on Vic Gerard's alleged breach of a "restrictive endorsement." In addition, Citizen's National and Mr. Entwisle counterclaim for damages against Vic Gerard for losses they might incur as a result of this lawsuit.

The issues were tried before the Court without a jury and, comprehensive briefs

1. Both Mr. DePalo and The Longest Drive, Inc., on numerous occasions transacted business within the State of Connecticut. Among other things, they sold golf carts in this state, maintained a bank account at Citizen's National, and financed sales of golf cars through that bank. The requisite minimum contacts with this state being present, and proper service pursuant to Fed.R.Civ.P. 4 having been made, this Court has jurisdiction over both defendants. Conn.Gen.Stat. §§ 33–411(b) and 52–59b. See also *Chemical Specialties Sales Corp., Industrial Div. v. Basic Inc.*, 296 F.Supp. 1106, 1109 (D.Conn.1968); *Harris v. Walker*, No. H-78 47, 5 Conn.L.Trib. No. 15, April 9, 1979 (D.Conn.1979). *Eutectic Corp. v. Curtis Noll Corp.*, 342 F.Supp. 761 (D.Conn.1972).

Neither of these defendants has appeared in this action. Therefore, a default judgment

must enter against them pursuant to Fed.R. Civ.P. 55(a).

2. In a post-trial motion, the plaintiff moves for permission to amend its complaint in two respects. First, it seeks to allege that the conduct of Citizen's National and Mr. Entwisle was "wanton, malicious, and reckless." The motion in this regard is denied. Second, it requests that the word "citizen" be inserted in place of the word "resident" in its allegation of diversity jurisdiction. This aspect of the motion to amend is granted. *Cox v. Livingston*, 407 F.2d 392, 393 (2 Cir. 1969); *National Farmers Union Property & Casualty Co. v. Fisher*, 284 F.2d 421, 423 (8 Cir. 1960); *Abdul-Warith v. Arthur G. McKee & Co.*, 488 F.Supp. 306, 309 n.2 (E.D.Pa.1980).

now having been filed, the case is ripe for decision.

## I

For a long time prior to December 1975, Mr. Jack DePalo and his corporation, The Longest Drive, Inc., were brokers for the sale of golf carts to various country clubs. The corporation maintained a general commercial checking account at Citizen's National, a small bank located in Fairfield, Connecticut. At various times the Longest Drive borrowed sums of money from the bank and, by 1976, was in default of obligations totalling almost $100,000, of which approximately $21,000 was unsecured.

Despite the fact that officials of the bank regarded Mr. DePalo as a "devious person," a "hustler," and an "unreliable businessman," he was a frequent visitor at the bank, used the bank's phone and secretarial services at times to conduct his business and continued to induce the bank to finance some of his golf cart transactions.

On December 11, 1975, the Garrison Country Club, ("Garrison"), located in Garrison, New York, entered into an agreement with Longest Drive for the purchase of 45 Johns-Manville Club Cars at a price of $1,500 per cart plus 15 four-bag attachments at $110 per unit. Garrison's parent corporation, NRC Realty Corporation ("NRC"), informed Mr. DePalo that it needed to finance $45,000 of the total purchase price of $74,256. Mr. DePalo, in turn, advised NRC that he would attempt to arrange the financing at Citizen's National.

At the time Mr. DePalo proposed the Garrison deal to Citizen's National, the bank and Mr. DePalo were engaged in litigation resulting from another golf cart financing transaction that had gone awry. Nevertheless, Citizen's National through Mr. Entwisle agreed to become part of the DePalo-Garrison contract. The three main inducements for the bank to become involved were: 1) NRC was a reputable, responsible company; 2) Mr. DePalo promised Mr. Entwisle that his $12,000 profit from the sale would be turned over to the bank to reduce his large indebtedness; and 3) the

bank determined it would "structure" the deal and control the "flow of money" in order to insure that Mr. DePalo would not manipulate the funds for his personal use. On January 19, 1976, the Discount Committee of Citizen's National authorized Mr. Entwisle to negotiate the financing for the carts.

Mr. Entwisle sent a commitment letter to Garrison/NRC on January 30, 1976, setting forth the terms of the proposed loan. Under the terms of that letter, Citizen's National agreed to finance the sale of the 45 Johns-Manville Club Cars at the rate of $1,000 per cart for a period of 36 months at 11% interest. Citizen's National would also have a security interest in the carts. In addition, Mr. Entwisle inserted the following paragraph:

> It is our understanding that the funds necessary in excess of the $45,000 loan provided by Citizen's, will be forwarded from Garrison Golf Club to Citizen's for the account of the Longest Drive, and that the Longest Drive shall issue a certified check drawn on its account at Citizen's for the total amount of $74,256.00 to Johns-Manville to complete the purchase of the 45 club cars.

On February 10, 1976, Garrison paid Mr. DePalo the sum of $5,000 as a deposit on the purchase of the golf carts. The funds were deposited into the Longest Drive checking account at Citizen's Bank and were eventually withdrawn by Mr. DePalo for his personal use.

Because Johns-Manville refused to recognize Mr. DePalo as a distributor of its carts and indicated it would not sell any carts to him, Mr. DePalo contacted Vic Gerard, an authorized distributor of Johns-Manville golf carts. There is no evidence that Mr. DePalo and Vic Gerard had any business relationship prior to this time. In March 1976, Vic Gerard agreed to deliver the 45 carts and 15 attachments to Garrison for the sum of $62,341.23, and required a $3,000 down payment. Mr. DePalo issued his personal check in that amount, but the check was dishonored. Thereupon Vic Gerard insisted that all payments be made by certified check.

On March 12, 1976, NRC signed the Loan and Security Agreement pursuant to which it borrowed $45,000 from Citizen's National. These funds were deposited in the Longest Drive account. After some initial confusion as to the proper payee of the check, Citizen's National issued a cashier's check for $41,341.23 to Vic Gerard on April 2, 1976, and turned the check over to Mr. DePalo. On the reverse side of the check, the following was inserted by Citizen's National:

By endorsing or obtaining the proceeds of the within check, the payee, in addition to the warranties by operation of law, further warrants to the Citizen's National Bank that (1) the payee has sold and delivered to N.R.C. Realty Corp. the following Jons (sic) Manville Club cars.

The serial numbers of the 45 golf carts were listed below this language.

Also on April 2, 1976, Mr. DePalo went to Vic Gerard's office in New Jersey and delivered the $41,341.23 check. Because the check was for "more than required" at that time, Vic Gerard gave Mr. DePalo back a check for $3,000, leaving a balance due of $24,000. Vic Gerard promised to deliver the carts when the $24,000 was paid.

On April 7, 1976, Mrs. Roberta Kanevsky, secretary and bookkeeper at Vic Gerard's, received a telephone call from Mr. DePalo who informed her that the $24,000 check from NRC had been deposited, and that he would have a certified check in that amount for Vic Gerard's driver when the carts were delivered to Garrison the following day. That evening 24 carts were delivered to Garrison. Mrs. Kanevsky also instructed Vic Gerard's driver to deliver 20 more carts the next day. Before removing them from the truck, however, he was to obtain the $24,000 certified check from Mr. DePalo.

On the morning of April 8th, the driver arrived at Garrison with the carts but Mr. DePalo did not have the certified check for him. Mr. DePalo called Mrs. Kanevsky and explained that Citizen's National was unable to certify the check because the funds were still "uncollected," i.e. NRC's check had not yet "cleared," and thus the funds had not yet been transferred to Citizen's National from Bankers Trust. He further suggested that Mrs. Kanevsky talk to Mr. Entwisle about the problem.

Mrs. Kanevsky thereupon called Mr. Entwisle who verified that NRC's check had been deposited into the account of Longest Drive but that it was still uncollected. According to Mrs. Kanevsky, Mr. Entwisle then stated that "at the end of ten working days I can issue a certified check," and that it was "all right for [Vic Gerard's] driver to leave the cars" at Garrison. Mrs. Kanevsky called Mr. DePalo and informed him that the bank would issue the check on April 19. She also instructed the driver to leave the carts.

At trial Mr. Entwisle admitted that on April 8th he received a "credit call" from Mrs. Kanevsky who inquired about the status of the funds in the Longest Drive account and also asked whether a check could be drawn against those funds. Mr. Entwisle explained that the $24,000 check was still uncollected and that it would take about ten days for the funds to be cleared. However, he strenuously denies ever assuring Mrs. Kanevsky that he would issue a certified check to Vic Gerard after the funds were transferred from Bankers Trust.

From April 8 to April 15, 1976, Mr. Entwisle repeatedly requested Mr. DePalo to pay the $12,000 as initially agreed. Finally, on April 15, Mr. Entwisle informed Mr. DePalo that he was going to "set off" the funds in the Longest Drive account. Hearing this, Mr. DePalo "became hostile" and "loud" and left the bank "in a huff." That same day, Mr. Entwisle caused a set-off ticket in the amount of $21,090.65 to be processed against the funds in the Longest Drive account. Subsequently, the balance remaining in the account was withdrawn by Mr. DePalo.

Although Vic Gerard paid Johns-Manville in full for the carts, Vic Gerard has not received the balance of the purchase price of $24,000 from Mr. DePalo, Longest Drive, or Citizen's National. This suit was instituted on March 28, 1977.

## II

█ As a general rule, a creditor-bank has a right of set-off against funds in its possession belonging to a debtor-depositor. See, e.g., *Katz v. First National Bank of Glen Head*, 568 F.2d 964, 967 (2 Cir. 1977); *Bassett v. City Bank & Trust Co.*, 115 Conn. 1, 31, 160 A. 60 (1932); Michie on Banks and Banking, §§ 115a (1950). It is also settled law, however, that funds deposited in a bank for a special purpose, known to the bank, or under a special agreement, cannot be set off by the bank against a debt due it from the depositor. Such funds constitute a special deposit, the distinctive feature of which is that the funds must be used for the specific purpose for which the money was deposited. *Bassett v. City Bank & Trust Co.*, supra; *Turkington v. First National Bank of New Milford*, 97 Conn. 303, 306–07, 116 A. 241 (1922).

It has also been observed that a bank may not offset a depositor's indebtedness where it has "sufficient knowledge of facts relating to the interests of others in the account to put the bank on inquiry to ascertain the trust character of the account." *Universal CIT Credit Corp. v. Farmers Bank of Portageville*, 358 F.Supp. 317, 325 (E.D.Mo.1973), quoting *Northern Ins. Co. v. Traders Gate City National Bank*, 239 Mo. App. 132, 186 S.W.2d 491, 497 (1945). In *Union Stock Yards Nat. Bank v. Gillespie*, 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724 (1890), a factor deposited the proceeds of the sale of a consignment of cattle under circumstances which alerted the bank that the funds equitably belonged to the factor's consignor. In holding that the bank could not apply the deposit to the payment of the individual debt of the factor, the Supreme Court noted:

[The factors] were in the commission business—known to the Bank to be in that business. They were not buyers and sellers, but factors-agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and while not of itself notice, is a circumstance to

compel inquiry on the part of the Bank in respect to any particular deposit.

137 U.S. at 415, 11 S.Ct. at 119. The Supreme Court hastened to caution that, of course, it is not in every case that a bank must inquire to determine whether the deposit of a broker or factor is a deposit for an unknown principle. Rather, a bank only need inquire "when there gather around any deposit or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor." *Id.* at 416, 11 S.Ct. at 120. See also *South Central Livestock v. Security State Bank*, 614 F.2d 1056, 1059–60 (5 Cir. 1980), affirming after remand, 551 F.2d 1346 (5 Cir. 1977); and cases collected in 8 A.L.R.3d 235, § 5(b).

## III

Applying this law to the facts of the instant case, it is the opinion of the Court that Citizen's National unlawfully set off NRC's payment against the debts due the bank from Jack DePalo and Longest Drive, and that these funds properly belong to Vic Gerard for several reasons.

█ First, for a long time prior to the transaction in question, Mr. Entwisle and Citizen's National were intimately familiar with the nature of Mr. DePalo's business because the bank had helped finance his other sales of golf carts. Furthermore, the bank knew and had known in this case that third parties had a direct interest in funds deposited in the account of Longest Drive. While these facts alone may not constitute the knowledge necessary to tilt the scales in favor of the plaintiff, they are sufficient to have placed the bank on notice that monies deposited in the account at any given time, in whole or in part, might well have belonged to another party.

Second, it is clear that Mr. Entwisle had actual knowledge that the Longest Drive account was merely a conduit through which NRC's payment of $24,000 was to be

passed on to the ultimate supplier of the golf carts, and that the funds did not belong to Mr. DePalo and Longest Drive. The credible evidence permits no inference to the contrary. From the outset of the transaction between Garrison and Mr. DePalo, Mr. Entwisle was aware that Mr. DePalo was not an authorized distributor of the Johns-Manville golf carts and that the carts had to be obtained by Mr. DePalo from another supplier. Whether or not Mr. Entwisle knew the supplier was to be Vic Gerard is of no moment. Someone other than Mr. DePalo was to supply the carts and, obviously, that person had to be paid from the funds generated by the business arrangements involving Mr. DePalo, Garrison, and Citizen's National. In any event, Mr. Entwisle knew of Vic Gerard's role in the transaction by April 2, 1976, two weeks before the set-off. Indeed, before the actual set-off on April 15, Mr. DePalo became hostile and protested vigorously, insisting that NRC's payment be forwarded to Vic Gerard rather than be offset against his debts.

Moreover, Mr. Entwisle, by way of the commitment letter to NRC, personally structured the terms and conditions of the sale of the golf carts "in order to control the flow of funds" between NRC and Mr. DePalo. That letter contained a special provision which specifically mandated that the balance due from NRC (the $24,000) had to be forwarded to a third party. According to Mr. Entwisle's own testimony, the paragraph was drafted so as "not to let DePalo get his hands on any of this money." Thus, it is patently illogical for Citizen's National, on the one hand, to admit that this provision in the commitment letter was inserted to foil any attempt by Mr. DePalo to appropriate the balance payment for his own use, and, on the other hand, to contend that the bank had the right to set off this same fund on the theory that its true ownership rested in Mr. DePalo.

Third, there is little question that during the telephone conversation with Mr. Entwisle on April 9th, Mrs. Kanevsky was induced to believe that a certified check for the balance of payment would be issued to Vic Gerard when NRC's check "cleared," and, that in reasonable reliance thereon, she released the 20 golf carts to Garrison.

Fourth, the balance of the equities tips decidedly in favor of the plaintiff. Without doubt, Mr. DePalo is the real villain here. However, the record is replete with evidence that Citizen's National negligently, or more charitably, naively, not only relied upon Mr. DePalo's representations to reduce his indebtedness to the bank, but also failed to prevent another episode of guile on Mr. DePalo's part. Citizen's National injected itself into the transaction and received the full benefit of its financing contract with NCR. In addition, by way of the set-off, the bank sought to recoup losses from a long-standing prior indebtedness incurred by Mr. DePalo. Thus, at the expense of Vic Gerard, an innocent third party, Citizen's National was paid over $20,000 of theretofore uncollectible debts, Garrison had its golf carts, Johns-Manville was made whole, and, ironically, Mr. DePalo received his entire $12,000 commission. Justice and equity dictate that, under these circumstances, the bank rather than Vic Gerard must suffer the loss.

■ Finally, the defenses of estoppel and breach of warranty, which are based on Vic Gerard's endorsement of the so-called "restrictive covenant" placed by Mr. Entwisle on the reverse side of the $41,341.23 check issued to the plaintiff on April 2, 1976, are devoid of merit and must be rejected. Even assuming that a breach of the "restrictive covenant" would create a cause of action against Vic Gerard, there is no evidence that Citizen's National changed its position in reliance upon plaintiff's endorsement, or that it exercised due diligence to ascertain the truth concerning delivery of the carts. In the absence of a showing of prejudice or damages, relief pursuant to these defenses would be unwarranted. See, *Bealle v. Nyden's Inc.*, 245 F.Supp. 86, 93–94 (D.Conn.1965); *Bianco v. Town of Darien*, 157 Conn. 548, 555, 254 A.2d 898 (1969).

IV

■ For these reasons, the plaintiff is entitled to recovery in the amount of $24,-

000. While it is true that Vic Gerard has yet to deliver one remaining cart to Garrison, this is a matter that must be resolved between NRC and Vic Gerard, and not between Citizen's National and Vic Gerard.

With respect to the issue of prejudgment interest under Conn.Gen.Stat. § 37–3a, equity requires that Citizen's National pay for the use of the funds wrongfully set off on April 15, 1976. See *Scribener v. O'Brien, Inc.,* 169 Conn. 389, 405–06, 363 A.2d 160 (1975); *Cecio Bros., Inc. v. Feldman,* 161 Conn. 265, 275, 287 A.2d 374 (1971); see also *Solar Kinetics v. Joseph T. Myerson & Son,* 488 F.Supp. 1237, 1250 n.17 (1980). However, because Citizen's National set off only $21,090.65 from the account of The Longest Drive, this is the amount on which the bank owes prejudgment interest. See *South Central Livestock v. Security State Bank,* supra, 614 F.2d at 1062.

In the absence of willful and wanton conduct on the part of Citizen's National, the plaintiff's request for attorney's fees is denied. See *The Theodore D. Bross Line Constr. Co. v. Ryan Crane Service Corp.,* 32 Conn.Sup. 181, 182, 345 A.2d 594 (1975); *Peterson v. City of Norwalk,* 152 Conn. 77, 80, 203 A.2d 294 (1964); 6 Moore's Federal Practice ¶ 54.77[2].

### V

Accordingly, a default judgment shall enter against Mr. Jack DePalo and The Longest Drive, Inc. In addition, judgment shall enter in favor of Vic Gerard as against Citizen's National in the amount of $24,000. Prejudgment interest shall be paid by Citizen's National on the sum of $21,090.65 from April 15, 1976. Judgment shall enter in favor of the plaintiff on the counterclaim.