358 F.Supp. 317 (1973)
UNIVERSAL C. I. T. CREDIT CORPORATION, a Delaware corporation, Plaintiff,
v.
FARMERS BANK OF PORTAGEVILLE, a Missouri Banking Corporation, Defendant.
No. S 71 C 82.
United States District Court, E. D. Missouri, Southeastern Division.
March 12, 1973.
*318 *319 Walter S. Drusch, Jr., Spradling, Bradshaw & Drusch, Cape Girardeau, Mo., for plaintiff.
James E. Reeves, Ward & Reeves, Caruthersville, Mo., for defendant.

MEMORANDUM AND ORDER
WEBSTER, District Judge.
Plaintiff, a Delaware corporation, brings this action against defendant Farmers Bank of Portageville, a Missouri banking corporation. Jurisdiction is founded upon diversity of citizenship under 28 U.S.C. § 1332. The amount in controversy exceeds $10,000.
Plaintiff's amended complaint is in three counts. In the first count, plaintiff seeks to recover $22,390.19 as the unpaid balance on checks drawn to plaintiff as payee and thereafter endorsed and presented to defendant, which refused payment. In count II plaintiff contends that it had a perfected security *320 interest in the proceeds of sales of certain automobiles, which proceeds were deposited in the debtor's account in defendant bank and which plaintiff contends were thereafter permitted by defendant to be withdrawn with knowledge of plaintiff's claim. The third count, denominated "alternative for improper failure and refusal to honor drafts" was abandoned at the trial.

Facts
Gerald W. Ryan, doing business as Ryan-Chevrolet and Olds Co., a proprietorship, operated an automobile dealership in Portageville, Missouri. On or about June 18, 1968, Ryan entered into an agreement with plaintiff for wholesale financing, commonly known as floor plan financing. Under the terms of this agreement, plaintiff from time to time advanced funds to pay the manufacturer's invoice on new automobiles, acquiring a security in such automobiles. As each automobile was sold by Ryan, he was required to remit plaintiff's advance. These remittances were in the form of checks drawn on Ryan's checking account at defendant's bank. The financing statements filed in New Madrid County reflect the security interest in the proceeds of the sale of the automobiles. Proper filing is not disputed.
Toward the end of 1969, plaintiff decided for reasons of policy, but primarily because it had not been supplied with current financial statements, to terminate the floor plan arrangement. Ryan was notified that the floor plan would be terminated December 31, 1969.
Sometime after 3:00 p. m. on January 15, 1970, Ryan had a conversation with Richard L. Saalwaechter, President of defendant bank. Ryan told Saalwaechter that he was being put out of business by plaintiff since plaintiff had revoked the floor plan, and that he wanted to be sure that the bank got paid. He said "let C.I.T. be lastthey put me out of business." Ryan discussed his debt to the bank on a demand promissory note. He told Saalwaechter that he wanted the bank to be safe on its loan. Ryan asked Saalwaechter to debit his account and credit the bank with $12,000 from his checking account. Saalwaechter then verified Ryan's checking account and determined that there was a balance of $16,340.00 When Saalwaechter suggested that Ryan write a check to the bank, Ryan told him that he preferred that the bank run a debit against the account because C.I.T. was after him and he didn't know what they could do to him. Ryan further told Saalwaechter that C.I.T. had checks out, and that he wanted to make a cash withdrawal to keep C.I.T. from getting its checks. Thereupon, although the bank's business day had closed at 3:00 p. m., Saalwaechter debited Ryan's account in the amount of $12,000.00. The next morning, January 16th, Ryan came to the bank and made a cash withdrawal of $3,100.00. Saalwaechter testified that he had no knowledge that any of Ryan's checks to C.I.T. were in the bank until after the debit and the withdrawal.
The funds in dispute derive from the sale by Ryan of six motor vehicles. In some cases, a trade-in was involved with which we are not concerned. In each case, Ryan received a check from the purchaser in payment of the cash portion of the deal. Each check was deposited in Ryan's account with defendant bank and he received full credit therefor. Each automobile sold and the proceeds thereof were subject to plaintiff's security interest. The checks representing the proceeds of the six automobiles sold by Ryan were all deposited on or prior to January 15, 1970 and aggregate $18,112.44.
Ryan executed and delivered to plaintiff five checks pursuant to the security agreement representing remittances for sums advanced by C.I.T. on account of such automobiles pursuant to the security agreement. These checks were deposited by plaintiff in its bank January 13, 1970. The checks were processed through the Federal Reserve System and were forwarded to defendant by Federal Reserve System cash letter January 14, 1970. The cash letters are regularly and *321 customarily delivered by courier from St. Louis the afternoon of the date of the cash letter, are deposited in defendant's bank night box and are opened the next morning for processing. The bank retains no record of the date or time of receipt of the cash letters. Portageville is 190 miles from St. Louis. The court finds from the applicable facts and circumstances in evidence, none of which are controverted, that the five Ryan checks in controversy were received by defendant bank on January 15, 1972 during banking hours.
The Bank of Portageville at that time operated on a deferred posting basis whereby the payor bank sorts and proves items received by it on the business day they are received, but does not post the items to the customer's account or return "not good" items until the next day. The practice typifies "production line" methods currently used in bank collection and is based upon the necessity of an even flow of items through payor banks on a day-by-day basis in a manner which can be handled evenly by employee personnel without abnormal peak-loads, night work, and other practices objectional to personnel. See Uniform Commercial Code Comment following § 400.4-301 R.S.Mo. 1969, V.A.M.S. Mr. Saalwaechter testified that on the day of receipt the cash letter tapes are checked for totals and the checks are individually examined for postdate, stale dates and endorsements. The posting takes place the day after receipt, using as the ledger posting date the actual date of receipt.
At some time on the afternoon of January 16, 1970, the bank discovered that there were insufficient funds with which to pay the five checks presented by plaintiff for payment, the bank having debited Ryan's account for $12,000 and Ryan having withdrawn $3,100 earlier that morning. Payment was refused and the checks were returned by mail through channels. Defendant wired the Federal Reserve office in St. Louis, giving notice of its non-payment.
Under a corresponding bank arrangement in effect at this time, defendant Bank of Portageville made settlement on checks delivered by St. Louis Federal Reserve System cash letter by accepting a debit to its account with Mercantile Trust Company National Association in St. Louis. In this instance, the cash letter charge or debit was in the amount of $213,271.14, and defendant's account at Mercantile was debited by Mercantile on January 16, 1970.

Liability Under Count I
Plaintiff contends that defendant bank failed to give timely notice of dishonor or make timely settlement and is therefore liable for the full amount of the checks under the applicable provisions of the Uniform Commercial Code in force in Missouri.
Plaintiff's reliance upon Central Bank and Trust Company v. First Northwest Bank, 332 F.Supp. 1166 (E. D.Mo.1971), aff'd 458 F.2d 511 (8th Cir. 1972) is misplaced. That case dealt not with failure to give notice of dishonor, but with failure to settle. The "midnight deadline" for returning an item or sending notice of dishonor is "midnight on its next banking day following the banking day on which it receives the relevant item. . . ." § 400.4-104(1)(h) V.A.M.S. The court's reference to a midnight deadline in Central Bank and Trust Company, supra, was directed to the separate requirement that a bank which is not also the depository bank is accountable for the item if it retains the item "beyond midnight of the banking day of receipt without settling for it. . . ." § 400.4-302 V.A. M.S. In any event, the defendant bank in the Central Bank and Trust Company case, supra, had not returned the item at all, and thus was deprived of other defenses. In this case, the items were protested[1] prior to the midnight deadline *322 as defined in V.A.M.S. § 400.4-104(1) (h).
We, therefore, turn to a consideration of plaintiff's second argumentthat defendant failed to make settlement, under its deferred posting procedure within the time required by § 400.4-302 V.A. M.S. and must therefore be accountable on this basis, since defendant's account at Mercantile Trust Company National Association was not debited until January 16, 1970, one day after the banking day of receipt.
During the period in question, defendant did not make provisional settlements on cash letters on the day of receipt. Settlement was regularly effected by Federal Reserve Bank of St. Louis drafting defendant's account with Mercantile Trust Company in St. Louis two days after the cash letter was issued. The checks which accompanied the cash letter were surveyed on business day of receipt for indications of trouble, such as endorsements, stale dates and post dates, as well as large checks on an account with an overdraw history. Mr. Saalwaechter testified that the defendant bank does not communicate any provisional credit. It simply waits to be drafted on its Mercantile Trust Company account.
As previously noted, § 400.4-302(a) V.A.M.S. makes a payor bank which is not also the depository bank accountable for the amount of a demand item if the bank retains the item "beyond midnight of the banking day of receipt without settling for it." While a bank has until midnight of the next banking day following the banking day of receipt to pay or return an item or send notice of dishonor (Section 400.4-302(a)), and thus revoke its provisional credit, this should not be confused with the requirement to settle by midnight of the banking day of receipt.
Mr. Saalwaechter assumed in testimony that settlement occurred when its account at Mercantile Trust Company was debited by the Federal Reserve Bank. He testified that an arrangement existed between defendant bank and the Federal Reserve System which made deferred posting possible. Because the testimony of settlement was inclusive, and in the interest of justice, the court set aside the previous submission and permitted additional evidence of the agreement with, or authorization to, the Federal Reserve Board to be made a part of the record.
The procedure for processing items contained in cash letters is set forth in Federal Reserve Bank of St. Louis Operating Letter 9A, which was in effect on the dates material to this case. Paragraph 7 thereof provides in part as follows:
"7. A paying bank must, unless it returns the accompanying cash items unpaid before midnight of the banking day of receipt, pay or remit for our cash letter, at par, on the banking day of receipt or, under terms agreed to with this bank, authorize or cause payment or remittance therefor to be made, at par, by debit to an account on our books not later than the banking day for this bank on which any other acceptable form of timely payment or remittance would have been received by us in the ordinary course."
See also Regulation J, Federal Reserve Board, 12 C.F.R. 210, Oct. 1, 1969, at Section 210.12return of cash items which authorizes each Federal Reserve Bank to include such provisions in its operating letters.
Pursuant to Regulation J and Operating Letters 9 and 9A, defendant bank and the Federal Reserve Bank of St. Louis entered into an agreement dated December 16, 1969, for the processing of cash items included in cash letters issued by the Federal Reserve Bank of St. Louis. Undersuch agreement, the gross amount of the cash letter would be charged to defendant's account with Mercantile Trust Company on the "automatic charge date," which was defined to be the Federal Reserve Bank's first banking day after defendant's first banking day after the date shown on the *323 cash letter. (Mr. Saalwaechter simplified this by saying the charge was put into effect two days after the date of the cash letter.)
The operating words, in the mid-night-of-banking-day-of-receipt requirement of Section 4-302 are "without settling for it."
"`Settle' means to pay in cash, by clearing house settlement, in a charge or credit or by remittance, or otherwise as instructed. A settlement may be either final or provisional."
§ 400.4-104(1)(j) V.A.M.S. (Emphasis supplied)
"The underlying theory and reason for deferred posting statements (Section 4-301) is to require a settlement on the date of receipt of an item but to keep that settlement provisional with the right to revoke prior to the midnight deadline." Official Comment 4, U.C.C. § 4-213.
It is clear to the court that the parties to the December 16, 1969 agreement intended to and did achieve a method of provisional settlement which eliminated the necessity of any formal action on the part of the payor bank (defendant) except to protest, prior to the midnight deadline, in the event the items were not acceptable.[2] Such prior authorization was the functional equivalent of a provisional settlement. Therefore the court finds that the defendant did make provisional settlement prior to midnight of the banking day of receipt (January 15th). Having already found that the defendant sent in an approved form of notice of dishonor prior to its midnight deadline (midnight of January 16th), it follows that defendant is not liable under Section 400-4.302 and the claim under Count I must fail.

Liability Under Count II
It is not disputed that plaintiff had a continuously perfected security interest in six automobiles and their proceeds. See § 400.9-306(3) V.A.M.S. Ryan sold separately each of these automobiles and deposited the amount received on each sale in his checking account at the defendant bank. Funds from other sources were deposited in the checking account prior to and contemporaneously with such deposits. Numerous checks were issued on the account between the time of the first and last sale. Plaintiff contends that the defendant bank was not entitled to debit Ryan's checking account in the amount of $12,000 on January 15, 1970, relying upon Section 400.9-306(2), which provides:
"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis supplied.)
Defendant contends that the proceeds from the sales of the six automobiles were not "identifiable" within the meaning of § 400.9-306(2). Defendant argues that when the proceeds were deposited and thereby commingled with other funds in Ryan's account and thereafter substantial withdrawals were made exceeding the amount of the deposited proceeds, the proceeds completely lost their identity. No Missouri case defines *324 the term "identifiable" as used in this section. It is provided in § 400.1-103 that all supplemental bodies of law continue to apply to commercial contracts except insofar as displaced by the particular provisions of the Uniform Commercial Code. Applying § 400.1-103, this court concludes that proceeds are "identifiable" if they can be traced in accordance with the state law governing the transaction. Missouri has recognized in an analogous situationsuits to impose a constructive trustthat special funds may be traced into commingled funds. Perry v. Perry, 484 S.W.2d 257 (Mo.1972). The mere fact that the proceeds from the sales of the six automobiles were commingled with other funds and subsequent withdrawals were made from the commingled account does not render the proceeds unidentifiable under Missouri law. As the court said in Perry v. Perry, supra at 259:
". . . where a defaulting trustee has first commingled the trust funds with his own and then paid them out in satisfaction of his own debts, it will be presumed that the payment was made from his own contribution to the commingled fund, `and not out of the trust money,' so that whatever is left is the money for which he is accountable in his fiduciary capacity. Lolordo v. Lacy, 337 Mo. 1097, 88 S. W.2d 353, 358; Cross v. Cross, 362 Mo. 1098, 246 S.W.2d 801, 803."
Perry v. Perry, 484 S.W.2d 257, 259 (Mo.1972).
Before tracing the proceeds, it is necessary to decide whether under the circumstances in this case the defendant bank was entitled to debit Ryan's checking account if the account contained proceeds from the sales of the six automobiles. Comment 2(c) to § 400.9-306 provides:
"Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party." (Emphasis supplied)
There are no Missouri cases on point. However, Missouri has long recognized that one indicia of a fraudulent conveyance is a transaction outside the usual course of doing business. Bank of New Cambria v. Briggs, 236 S.W.2d 289, 291 (Mo.1951). In Missouri, "fraud, like any other fact, may be established by circumstantial evidence [and] [t]here are circumstances which have come to be recognized as indicia or badges of fraud, one of which circumstances alone may not prove fraud, but may warrant an inference of fraud, especially where there is a concurrence of several indicia of fraud." Id. Ryan told Saalwaechter that plaintiff had revoked the floor plan and that he wanted the bank to be safe on its loan. Ryan asked Saalwaechter to debit his account. When Saalwaechter suggested that Ryan write a check to the bank, Ryan indicated that he preferred the bank run a debit against the account and further informed Saalwaechter that he had issued checks to plaintiff and wished to keep plaintiff from collecting on the checks. All of these events, including the debit to Ryan's account, transpired after the close of business on January 15, 1970. These facts clearly show that the debit of Ryan's account was not in the ordinary course of business. Although, as indicated above, there are no Missouri cases directly on point, this court concludes that the Missouri courts would not, under these circumstances, permit the defendant bank to retain the amount debited outside the usual course of business and thereby defeat the security interest of plaintiff in the identifiable proceeds of the sale of the six automobiles.
*325 Support for this conclusion is also found in the law governing a bank's right of set-off. As a general rule an account constituting a general deposit is subject to the bank's right of set-off. First National Bank of Clinton v. Julian, 383 F.2d 329, 338 (8th Cir. 1967), applying Missouri law and following Adelstein v. Jefferson Bank & Trust Company, 377 S.W.2d 247, 251 (Mo. 1964). An exception to that general rule is that a bank is not entitled to a set-off where it has "sufficient knowledge of facts relating to the interests of others in the account as to put the bank on inquiry to ascertain the trust character of the account." Northern Ins. Co. v. Traders Gate City National Bank, 259 Mo.App. 132, 186 S.W.2d 491, 497 (1945) following Brown v. Maguire's Real Estate Agency, 343 Mo. 336, 121 S.W.2d 754 (1938). The Northern Insurance Company case indicates that the bank's knowledge of the "trust character" of a deposit can be shown by indirect evidence or by showing that the bank would have sufficient information to put it on inquiry as to the trust character of the deposit. 186 S.W.2d at 498. The bank's knowledge that Ryan had floor plan financing with plaintiff, that Ryan had issued checks to plaintiff which Ryan did not want collected by plaintiff, and Ryan's insistence that the bank run a debit against his account, coupled with the communication of such facts after banking hours, were sufficient to put the bank on inquiry as to the possible trust character of all or part of the funds deposited in Ryan's account. Moreover, it is disputable whether the bank, even absent knowledge of the above facts, would be entitled to a set-off. In Associates Discount Corp. v. Fidelity Union Trust Company, 111 N. J.Super. 353, 268 A.2d 330 (1970), 7 U. C.C.Rep. 1350, a bank set off part of an account of one of its debtors which contained proceeds in which another party held a continuously perfected security interest. The defendant relied on N.J. S.A. 12A:9-104(i), which is identical to § 400.9-104(i), V.A.M.S., and provides:
"[T]his Chapter does not apply . . .
* * * * * *
"(i) to any right of set-off. . . ."
In response to the defendant's argument that it was entitled to the right of set-off, the court said:
"This section, however, cannot mean that a general creditor, as the bank is here with respect to the funds in question, may abrogate a perfected security interest simply by having a right to an opportunity for a set-off. All this section means is that a right of set-off may exist in a creditor who does not have a security interest."
268 A.2d at 332.
The bank then contended that it was entitled to a set-off in the account in the absence of actual knowledge on its part that the funds in the account were subject to a security interest. The defendant relied on cases decided prior to the adoption of the Uniform Commercial Code in New Jersey. In response, the court said:
"However, these cases, if applicable, are subject to the superior authority of the Legislature which, by enacting the Uniform Commercial Code, continued a plaintiff's security interest in the identifiable proceeds of sales of the collateral. N.J.S.A. 12A:9-306 (2)." Id.

This court's final task is to trace the proceeds of the sales of the six automobiles to determine if they were taken by the bank when it debited Ryan's account after the close of business on January 15, 1970. As indicated above, Perry v. Perry, supra, 484 S.W.2d at 259, stated the general rule that in tracing commingled funds it is presumed that any payments made were from other than the funds in which another had a legally recognized interest. This is commonly referred to as the "lowest intermediate balance" rule. Restatement of Trusts, Second, § 202, Comment j provides in pertinent part:
"j. Effect of withdrawals and subsequent additions. Where the trustee *326 deposits in a single account in a bank trust funds and his individual funds, and makes withdrawals from the deposit and dissipates the money so withdrawn, and subsequently makes additional deposits of his individual funds in the account, the beneficiary cannot ordinarily enforce an equitable lien upon the deposit for a sum greater than the lowest intermediate balance of the deposit. . . ."
Illustration 20 to Comment j is as follows:
"A is trustee for B of $1,000. He deposits this money together with $1000 of his own in a bank. He draws out $1500 and dissipates it. He later deposits $1000 of his own in the account. He is entitled to a lien on the account for $500, the lowest intermediate balance." Comment j, Illustration 20, Restatement of Trusts § 202 at 544 and Restatement of Trusts, Second, § 202 at 451.
The situation in the instant case differs from Comment j and the Illustration in one respect. We have not one, but six, separate deposits of funds of a "trust character" spanning a period of nearly a month, during which time a substantial number of withdrawals and deposits of other funds were made in the account. Comment m to the Restatement of Trusts, Second, § 202 at 453 provides:
"m. Subsequent additions by way of restitution. Where the trustee deposits trust funds in his individual account in a bank, and makes withdrawals from the deposit and dissipates the money so withdrawn, and subsequently makes additional deposits of his individual funds in the account, manifesting an intention to make restitution of the trust funds withdrawn, the beneficiary's lien upon the deposit is not limited to the lowest intermediate balance.
"Where the deposit of trust funds and of his individual funds was in an account in the name of the trustee as such, and not in his individual account, and he withdraws more than the amount of his individual funds, and subsequently deposits his individual funds in the account, the beneficiary's lien upon the deposit is not limited to the lowest intermediate balance since the new deposit will be treated as made by way of restitution of the trust funds previously withdrawn." (Emphasis supplied.)
Thus, individual funds subsequently deposited to a trust account by the trustee are presumed to be by way of restitution. Perry v. Perry, supra at 259. Subsequent deposits by the trustee to his own account, on the other hand, are not so treated unless the trustee "manifests an intention to make restitution." No such manifestation of intent was shown in this case. Therefore, subsequent deposits of funds not relating to the proceeds from the sales of the six automobiles in Ryan's individual d/b/a account will not be treated as made by way of restitution of trust funds previously withdrawn.
However, each deposit of the proceeds of the sales of the six automobiles will be treated as additions to the trust fund, and the lowest intermediate balance theory will be followed.
It was stipulated at trial that the following deposits were received by Ryan from the sale of the six automobiles and their proceeds in which plaintiff held a continuously perfected security interest:

 Vehicle Serial No. Purchaser Date of Deposit Amount
1. 1969 Chev. 866578 Campbell 12-19-69 $5,700.00
2. 1970 Olds. 217371 Faulkner 12-20-69 4,125.00
3. 1969 Chev. 890453 Hunter 1-09-70 1,599.94
4. 1970 Chev. 138013 Carlisle 1-12-70 2,237.50
5. 1970 Olds. 160314 Rone 1-15-70 2,700.00
6. 1970 Chev. 141638 Hendricks 1-15-70 1,750.00

*327 The court has examined the banking records of the Ryan account and finds that the identifiable proceeds in which plaintiff held a continuously perfected security interest on January 15, 1970 prior to the bank's $12,000 debit entry was $11,429.11. This amount may be traced according to the following summarization:

 "Proceeds"
 "Proceeds" End Remaining
 Date Deposited Balance in Account
12-18-69 $ 710.74
12-19-69 (1) $5,700.00 9,100.58 $ 5,700.00
12-20-69 (2) 4,125.00 9,709.90 [*]9,709.90
12-24-69 6,201.41 [*]6,201.41
 1-02-70 4,715.30 [*]4,715.30
 1-09-70 (3) 1,599.94 11,987.65 6,315.24
 1-12-70 (4) 2,237.50 15,426.72 8,552.74
 1-14-70 6,979.11 [*]6,979.11
 1-15-70 (5) 2,700.00
 (6) 1,750.00 16,340.00 11,429.11

On January 15, 1970, the bank debited against the Ryan account checks aggregating $516.65 and in addition made the $12,000.00 debit entry in its favor. The $12,000.00 debit entry was made at 3:00 p.m. after the close of business. It may, therefore, be inferred that the checks aggregating $516.65 were received prior thereto in the ordinary course on January 15, 1970 during banking hours. The pro forma balance prior to the $12,000.00 debit entry was, therefore, $15,823.35. Subtracting from this amount the "proceeds" remaining in the account ($11,429.11), the amount which the bank was entitled to debit was $4,394.24. Accordingly, plaintiff is entitled to recover from the bank the excess amount debited, or $7,605.76. That amount is identified as proceeds in which plaintiff had a perfected security interest, and plaintiff is entitled to recover this amount, together with interest at 6% from October 26, 1970, the filing date of the complaint. The Clerk will enter judgment in favor of plaintiff on Count II in accordance with this Memorandum.
This Memorandum constitutes the court's Findings of Fact and Conclusions of Law.
So ordered.
NOTES
[1] Federal Reserve Bank of St. Louis Operating Letter No. 9, September 1, 1967, para. 20.
[2] Section 400.4-103 V.A.M.S. provides in pertinent part as follows:

"(1) The effect of the provisions of this article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.
"(2) Federal Reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled. * * *"
[*] Lowest Intermediate Balance