**GENERAL ELECTRIC CAPITAL CORP., Plaintiff,**

v.

**UNION PLANTERS BANK, N.A., Defendant.**

No. 4:01CV1183ERW.

United States District Court,
E.D. Missouri,
Eastern Division.

Jan. 16, 2003.

David E. Runck, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, Main counsel for Plaintiff GE Capital.

Mark Goodman, Capes, Sokol, Goodman & Sarachan, St. Louis, MO, Local counsel for Plaintiff GE Capital.

Jeffrey S. Heuer, The Stolar Partnership, St. Louis, MO, Counsel for Defendant Union Planters.

### MEMORANDUM AND ORDER

WEBBER, District Judge.

Before the Court is Plaintiff's Motion for Partial Summary Judgment and for Appointment of a Special Master [doc. # 40], Plaintiff's Motion for Partial Summary Judgment On Conversion Damages [doc. # 55], and Defendant's Motion for Summary Judgment [doc. # 56].

## I. Background facts

This is a secured transactions problem involving Article 9 of the Uniform Commercial Code, and the essential facts are undisputed. Machinery, Inc. (the debtor) owed money to both GE Capital and Union Planters Bank. In late November 1997, GE Capital entered into a Floor Plan Agreement with the debtor, promising to lend up to $5 million for the debtor to acquire certain pieces of aerial equipment called manlifters that the debtor would use as inventory in its equipment rental and sale business. In return, the debtor granted GE Capital a security interest in all the debtor's inventory that GE Capital financed, whether then owned or after-acquired, as well as the proceeds of that inventory.[1] GE Capital filed UCC-1 financing statements describing the inventory and the proceeds in the appropriate state and county offices on December 29, 1997. The debtor had similar borrowing relationships with several other financial entities; the entities would loan the debtor money for the purpose of purchasing specific items of inventory and the debtor granted that particular creditor a security interest in the goods purchased.

Defendant Union Planters was also one of the debtor's secured creditors. Union Planters had agreed to loan a certain amount of money to the debtor; in exchange the debtor signed various promissory notes, and gave Union Planters security interests in certain items of collateral. The record does not indicate when Union Planters began making loans to the debtor, but it is clear that loans had taken place for some time before March 3, 2000. As of March 1, 2001, there were 11 notes outstanding, and each note had a corresponding security agreement indicating which collateral secured which note. Of the 11 notes, 10 were loans secured by specific items of collateral and the proceeds from that collateral. The remaining note was a line of credit secured by all of the debtor's inventory, accounts, and the proceeds therefrom. Each note gave Union Planters a security interest in each of the three

---

1. The debtor also gave GE Capital a security interest in the debtor's leases, accounts, chattel paper, credits, and other items, as well as the proceeds from them, but these categories are not relevant to this motion.

debtor's bank accounts, and also gave Union Planters the right to "setoff" against those accounts all sums owing under the promissory notes. Union Planters and the debtor agreed on the line of credit loan on July 5, 2000, and the original loan principal for the line of credit was for $1,250,000. Although the record does not indicate how, Union Planters asserts that they perfected all of their attached security interests, and GE Capital does not dispute that.

While Union Planters was one of the debtor's creditors, it was also the debtor's depositary bank. On April 10, 2000, Union Planters agreed to set up a Cash Management System for the debtor. The agreement set up three bank accounts: (1) a lockbox deposit account; (2) a payroll account; and (3) a general expense account. The Cash Management System contemplated that the debtor would deposit all of its receipts in the lockbox deposit account. When it came time for the debtor to pay its payroll or its general expenses, Union Planters would automatically transfer just enough funds from the lockbox deposit account into the other two accounts to cover the checks the debtor wrote for those expenditures. The payroll account and the general expense account were thus called "zero balance accounts," because they only contained the exact amount of funds necessary to cover checks drawn on them, and the debtor never deposited any funds into them. If there were not enough funds in the lockbox deposit account to cover payroll and other business expenses, Union Planters would transfer funds into the appropriate account from the line of credit. In the end, if there were any funds remaining in the lockbox deposit account after the debtor paid its payroll and business expenses, Union Planters automatically transferred or swept those funds from the lockbox deposit account to itself to reduce the principal balance on the line of credit the debtor owed Union Planters. All of the funds the debtor deposited into the lockbox deposit account were commingled. The debtor did not in any way segregate the collateral proceeds according to their source or secured creditor; neither GE Capital nor Union Planters suggested that the debtor do so.

Beginning in March 2001, Union Planters terminated certain automatic features of the Cash Management System because the debtor was in default on its loans to Union Planters. Instead of automatically transferring money from the lockbox deposit accounts to the other accounts to cover any checks the debtor wrote, Union Planters required the debtor to provide a report of checks they wrote on the other accounts before Union Planters transferred the funds into the appropriate accounts to cover the checks. Union Planters still continued to sweep the excess funds from the lockbox deposit account to reduce the debtor's principal balance on the line of credit.

Meanwhile, the debtor defaulted on its payment obligations to GE Capital under the Floor Plan Agreement around February 2000. On March 3, 2000, GE Capital and Union Planters entered into a Subordination Agreement. In that agreement, Union Planters acknowledged that its security interest in the debtor's inventory or proceeds from the inventory was subordinate and junior to any security interest which GE Capital might have in the same collateral.[2] Even after the parties executed

---

2. In the subordination agreement, Union Planters agreed that it was junior with respect to every piece of property the debtor had for which GE Capital claimed a security interest and filed a financing statement. Thus, the collateral Union Planters agreed to subordinate was more than its interest in inventory and proceeds, but the opinion only discusses those items because they are the only items in dispute.

the subordination agreement, neither GE Capital nor Union Planters discussed segregating the cash proceeds of the debtor's equipment that GE Capital financed.

In March 2001, debtor defaulted on its Union Planters promissory notes. At this time, Union Planters continued to sweep funds from the debtor's lockbox deposit account to reduce the debtor's principal balance on the line of credit, as they had always done. On March 16, GE Capital sent Union Planters a letter notifying them of GE Capital's superior interest in certain inventory and their proceeds and requesting that Union Planters turn over to GE Capital's risk manager all of GE Capital's collateral in their possession. The letter also asked Union Planters to turn over all GE Capital that might come in later, and requested a meeting between the parties and the debtor to determine if any of the money previously deposited in the debtor's Union Planters bank accounts should properly be turned over to GE Capital. Union Planters continued to sweep funds from the debtor's lockbox deposit account to pay itself back until the debtor filed for Chapter 11 bankruptcy protection on March 29, 2001.[3]

In this lawsuit, GE Capital claims that beginning January 1, 2001, Union Planters' sweeping of funds from the debtor's bank account to pay down its line of credit was wrongful because it interfered with GE Capital's first priority security interest in the cash proceeds of GE Capital's collateral; their position is it was wrongful because Union Planters swept money that constituted proceeds from the sale or rental of GE Capital's collateral. GE Capital's five-count complaint seeks a declaratory judgment that Union Planters improperly set off funds against the debtor's deposit account, and alleges causes of action for: (1) breach of the subordination agreement; (2) conversion; (3) tortious interference with contract; and (4) unjust enrichment.

GE Capital now moves for partial summary judgment on its conversion claim, and argues in a separate partial summary judgment motion that it is entitled to $200,389.57 in damages for that count. Union Planters cross-moves for summary judgment on all of GE Capital's claims.

## II. Summary judgment standard

Summary judgment is appropriate only if all of the information before the court shows there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those that might affect the outcome of the suit under the governing law. *Id.* Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, ... there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir. 1988). The burden then shifts to the non-moving party who must set forth specific

---

**3.** The debtor's bankruptcy case is pending in the bankruptcy court for this district; Case No. 01–43526–293. The bankruptcy court will decide the priority of post-bankruptcy petition proceeds; this Court is concerned with pre-petition proceeds only.

evidence showing that there is a genuine dispute as to material issues. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. *Id.* The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. *Id.*

### III. Discussion

 In diversity cases, the Court applies the substantive law of the state where the Court sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To recover for conversion of the cash proceeds under Missouri law, GE Capital must prove that Union Planters was unauthorized in assuming the right of ownership of the proceeds to the exclusion of GE Capital's rights. *Bell v. Lafont Auto Sales*, 85 S.W.3d 50, 54 (Mo.Ct.App.2002). One may prove conversion by showing either (1) a tortious taking; (2) a use or appropriation by the defendant indicating a claim or right in opposition to the owner; or (3) a defendant's refusal to give up possession on

demand. *Id.* In a secured transactions case, a conversion recovery is appropriate only if the party seeking to impose liability has the right to immediate possession. *MFA, Inc. v. Pointer*, 869 S.W.2d 109, 111 (Mo.Ct.App.1993). In this case, as a secured party claiming a superior property right to Union Planters, GE Capital's right to immediate possession of the cash proceeds depends on whether it possessed a valid security interest in the proceeds, and if so, whether that security interest was ever extinguished.

GE Capital's ability to prevail on any of its claims, then, depends on two issues: (1) whether GE Capital's security interest ever attached to the cash proceeds of the debtor's equipment sales; and (2) if it did, whether GE Capital lost its security interest under Comment 2(c) to the old version of § 9–306(2) of the Uniform Commercial Code[4] when Union Planters swept funds from the debtor's lockbox deposit account to pay down the line of credit.

### A. Did GE Capital's security interest in cash proceeds ever attach?

 GE Capital's security agreement with the debtor gave GE Capital a security interest in certain pieces of equipment and their proceeds.[5] UCC § 9–306(2) states the general rule that a secured party's interest in collateral attaches automatically to *identifiable proceeds* received by a debt-

---

4. All references to the Uniform Commercial Code in this opinion are to the 1972 Official Text because GE Capital and the debtor entered into the security agreement in December 1997—before the National Conference of Commissioners on Uniform State Laws promulgated Revised Article 9. In addition, although one would usually cite a particular UCC section in Missouri as Mo.Rev.Stat. § 400.9–306, for example, the Court will refer simply to § 9–306 as Missouri did not make any changes to the Official Text in its version. The Court notes that the Missouri General

Assembly adopted Revised Article 9, and it became effective on July 1, 2001.

5. UCC § 9–306(1) defines proceeds, in part, as whatever is received upon the sale, exchange, collection or other disposition of collateral; the subsection includes money within the rubric of "cash proceeds." The Court notes that even if the security agreement did not explicitly cover proceeds, the Code would have given GE Capital a security interest in the proceeds, subject to the rules in § 9–306(2). *See* UCC § 9–203(3).

or upon disposition of that collateral. UCC § 9–306(2) (emphases added). For GE Capital to enforce their security interest in the cash proceeds, then, the law requires that GE Capital prove a transactional link between the particular proceeds they are seeking and the collateral they financed.[6] GE Capital faces a problem, however, because the debtor deposited all of its money—including proceeds from GE Capital-financed equipment—into its lockbox deposit account at Union Planters Bank. Union Planters argues that this commingling destroys identifiability. Thus, according to Union Planters, GE Capital has no way to prove that any of the money currently in the debtor's account corresponds to any of GE Capital's inventory collateral. With GE Capital unable to make a claim to specific proceeds, Union Planters contends that GE Capital has no enforceable security interest, and all of GE Capital's claims should, therefore, fail as a matter of law.

Union Planter's argument has some support,[7] but it has been rejected by an overwhelming majority of courts. In fact, this Court was one of the first to treat this issue when it decided *Universal C.I.T.*

*Credit Corp. v. Farmers Bank of Portageville,* 358 F.Supp. 317 (E.D.Mo.1973). C.I.T. financed the debtor automobile dealership under a floor plan arrangement, taking a security interest in the debtor's inventory of automobiles and the proceeds from their sale. Just like the debtor here, the car dealer sold some cars and deposited the funds in its general checking account where they became commingled with non-proceeds. The car dealer also owed money to Farmers Bank, where it had its bank accounts. C.I.T. decided to revoke the floor plan, so the car dealer went to Farmers' president and told him that he wanted the bank to be safe on its loan, and for C.I.T. to be last. *Id.* at 319. The dealer asked the bank to take $12,000 from the dealer's checking account to pay the dealer's debt to the bank. C.I.T. sued Farmers Bank, arguing that the bank's setoff of the $12,000 constituted a conversion of collateral to which C.I.T. held a superior perfected security interest.

Like Union Planters, the bank argued that the proceeds were not identifiable within the meaning of § 9–306(2) because they were in a commingled bank account.

---

**6.** The Code also refers to identifiable proceeds in the context of perfection of a security interest. UCC § 9–306(3) states that an attached security interest in proceeds is continuously perfected if the interest in the original collateral was perfected, but it becomes unperfected 10 days after the debtor receives the proceeds unless either of a few conditions apply. If the proceeds are "identifiable cash proceeds," the temporary perfection becomes continuous automatic perfection, but unless the original collateral was "investment property," the security interest in the original collateral must have been perfected by filing a financing statement. *See* UCC § 9–306(3)(b). Here the parties don't seem to dispute the perfection issue—GE Capital perfected its interest in the debtor's inventory by filing a financing statement. When Union Planters argues that the cash proceeds here were not identifiable, it is not clear if it means identifiable within the meaning of § 9–306(2) or

"identifiable cash proceeds" within the meaning of § 9–306(3)(b)—indeed it is not clear if that is even a relevant distinction. In any event, Union Planters does not argue that if the security interest attached to proceeds, it became unperfected after the Code grace period. Union Planters contends simply that the security interest was never valid because the funds were commingled. Thus the Court will conclude that whatever security interest attached in the proceeds was properly perfected.

**7.** Grant Gilmore, the principal author of Article 9, argued in his influential treatise that placing proceeds in a commingled bank account destroyed the identifiability of the proceeds, and thus the underlying security interest. *See* Grant Gilmore, *Security Interests in Personal Property* § 27.4, at 735–36 (1965).

Noting that the Code did not define "identifiable" and finding no Missouri cases interpreting the term, the court turned to UCC § 1–103 which allows courts to supplement the Code with common law principles unless the Code specifically displaces them. *Id.* at 324. Applying that section, the court concluded that the cash proceeds were "identifiable" if they could be traced in accordance with state law. *Id.* The court relied on *Perry v. Perry,* 484 S.W.2d 257 (Mo.1972), a case imposing a constructive trust on commingled funds, to hold that the mere commingling of proceeds in a single bank account does not make the proceeds "unidentifiable" in the secured transactions context. *Id.*

After concluding that the proceeds were identifiable, the Court allowed C.I.T. to use an accounting fiction known as the "lowest intermediate balance" rule to trace the funds. *Universal C.I.T.,* 358 F.Supp. at 325. C.I.T. needed the fiction because without it, the company could not prove which deposits were proceeds of its collateral, nor could it prove that the proceeds of its collateral were not dissipated by subsequent withdrawals from the bank account. The lowest intermediate balance rule uses presumptions incorporated from trust law. First, any withdrawals from the account are first taken from the "nontrust" funds—in this case proceeds not subject to the security interest—and only after all of those funds are exhausted are withdrawals taken from the plaintiff's proceeds. *See* Restatement (Second) of Trusts § 202, Comments on Subsection (1):(i)-(m) (1957); Restatement of Restitution §§ 211–212 (1937); William H. Henning, *Article Nine's Treatment of Commingled Cash Proceeds in Non–Insolvency Cases,* 35 Ark. L.Rev. 191, 228–230 (1981). Then, if the balance in the account falls below the amount of the funds subject to the plaintiff's interest that have been deposited in the account, the plaintiff is limited to the lowest intermediate balance[8] between the time of commingling and the time at which rights in the account are to be determined. *Id.* Second, where additional deposits of "nontrust" funds are made, they are not deemed to be in restitution of the amount by which trust funds have been depleted unless the depositor manifests an intention that there be restitution or the account is maintained as a trust account rather than an individual account. *Id.* Applying the lowest intermediate balance rule, the court concluded that $11,429.11 remained in the account, and awarded C.I.T. this remainder. *Universal C.I.T.,* 358 F.Supp. at 327.

Although C.I.T. made the effort to take a security interest in proceeds, the Court's decision to allow the company in a nonconstructive trust case to use fictional tracing rules to prove the transactional link between the inventory collateral and the proceeds was questionable. *See generally* Richard L. Barnes, *Tracing Commingled Proceeds: The Metamorphis of Equity Principles Into U.C.C. Doctrine,* 51 U. Pitt. L.Rev. 281 (1990); William H. Henning, *Article Nine's Treatment of Commingled Cash Proceeds in Non–Insolvency Cases,* 35 Ark. L.Rev. 191, 231–235 (1981). The Restatement of Restitution

---

**8.** Restatement (Second) of Trusts § 202, comment j, illustration 20 gives an example of the an application of the lowest intermediate balance rule.

A is trustee for B of $1,000. He deposits this money together with $1,000 of his own in a bank. He draws out $1,500 and dissipates it. He later deposits $1,000 of his own in the account. He is entitled to a lien on the account for $500, the lowest intermediate balance.

Restatement (Second) of Trusts § 202, Comment on Subsection (1):(j) at 544 (1957).

suggests that constructive trusts may be imposed in cases of fraud, mistake, duress, and undue influence. *See* Restatement of Restitution § 166–168 (1937). Professor Barnes, in an exhaustive search, identified 4 categories of commercial cases where pre-Code common-law courts imposed constructive trusts and allowed parties to use fictional tracing rules—fraud, breach of fiduciary duty, inappropriate garnishment and contract breach by unauthorized dispositions. *See Barnes* at 328. Barnes points out that virtually all of the cases involved an unauthorized disposition of collateral. *Id.* at 305. He suggests that the conduct involved universally amounted to the type of wrongful conduct the courts faced in non-commercial settings. *Id.* at 306. Missouri cases support Barnes' view.[9]

In *Perry v. Perry*, 484 S.W.2d 257 (Mo. 1972)—the case the court cited to support its tracing analogy—a deceased-insured had promised his soon-to-be-former wife, as part of the divorce settlement, that he would change the names of the beneficiaries of his three insurance policies from his mother to his minor children. *Id.* at 258. The insured never changed the names, and the insurance companies paid the mother. The mother knew about her son's contract at the time of the divorce but decided to continue paying the premiums on the policy, commingled the funds with her own, and rejected the children's demand for the money. The court allowed the wife to impose a constructive trust on the insurance proceeds on behalf of the children. *Id.* at 258–59. The *Universal C.I.T.* court

did not, however, explain the connection between the equitable policy implications in *Perry* and the commercial transaction at issue in *Universal C.I.T.*—it just found a case where the Missouri Supreme Court allowed tracing in a commingled fund and adopted that court's reasoning.

One can argue that the equities do not warrant allowing parties like C.I.T. and GE Capital to trace in this situation because they did not make any efforts to force the debtor to segregate, in a separate bank account, the proceeds flowing from the sale of their particular collateral. Although recognizing this, and acknowledging that the constructive trust analogy in *Universal C.I.T.* was weak, Professor Henning suggests that the result is acceptable. In light of the Uniform Commercial Code's encouraging secured parties to allow debtors to retain control of their proceeds and use them in running their businesses, Henning argues, courts are justified in protecting secured parties who make use of these provisions. William H. Henning, *Article Nine's Treatment of Commingled Cash Proceeds in Non–Insolvency Cases*, 35 Ark. L.Rev. 191, 196 (1981). The result in *Universal C.I.T.* is acceptable because there was strong evidence that the debtor and the bank colluded to harm the secured party. In any event, the courts, mostly relying on *Universal C.I.T.* are nearly unanimous in holding that mere commingling does not destroy the identifiability of proceeds, and have allowed tracing in cases on far less egregious facts.[10]

**9.** *See, e.g., State ex rel Shull v. Liberty Nat'l Bank*, 331 Mo. 386, 53 S.W.2d 899 (1932) (wrongdoer acquiring assets by fraud); *State ex rel Cantley v. Akin*, 224 Mo.App. 114, 22 S.W.2d 836 (1929) (breach of contract where administrator of estate failed to honor an agreement to turn over the proceeds of the sale of mortgaged personal property); *United*

*Film Ad Service v. Roach*, 222 Mo.App. 339, 297 S.W. 91 (1927) (similar).

**10.** *See, e.g., Brown & Williamson Tobacco Corp. v. First Nat'l Bank*, 504 F.2d 998 (7th Cir.1974); *Ex parte Alabama Mobile Homes, Inc.*, 468 So.2d 156 (Ala.1985); *C.O. Funk & Sons, Inc. v. Sullivan Equipment, Inc.*, 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370

Both the National Conference of Commissioners on Uniform State Laws and the American Law Institute appear to have approved the result in these cases because the Revision of Article 9 explicitly allows parties like GE Capital to trace in this situation. Revised UCC § 9–315(b)(2) includes commingled non-goods proceeds within the definition of identifiable if the secured party identifies the proceeds through methods of tracing, including the application of equitable principles under state law.

In this case, it is clear that GE Capital took a considerable interest in the debtor's cash proceeds—it specifically named the proceeds in both the security agreement and the financing statement and it obtained a subordination agreement from Union Planters with respect to the proceeds. The Court holds based on the equities, the overwhelming judicial authority and the policies inherent in encouraging parties to obtain secured financing, that GE Capital may use the lowest intermediate balance rule to trace its cash proceeds into the debtor's bank account; thus GE Capital's security interest in the proceeds of its inventory collateral properly attached.

## B. Was GE Capital's security interest severed under comment 2(c) to § 9–306?

 Union Planters argues that even if GE Capital once had a valid security interest in the debtor's proceeds, it lost it when Union Planters swept the debtor's funds

from the lockbox deposit account to pay down the debtor's line of credit principal balance. Comment 2(c) to § 9–306 provides:

*Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.*

UCC § 9–306, comment 2(c) (emphases added).

Union Planters contends that their sweeping of the funds from the deposit account was an "ordinary course transfer" within the meaning of this comment because it was their regular practice to do so under the terms of the Cash Management System they had in place with the debtor, and because the debtor was effectively making these payments in the ordinary course of its business.

### (1) Prior court decisions

No Missouri State court has interpreted comment 2(c), and the courts that have are sharply divided. In *Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville,* 358 F.Supp. 317, 324–25 (E.D.Mo.1973) the court considered comment 2(c) and found

---

(1982); *Coachmen Indus., Inc. v. Security Trust & Sav. Bank,* 329 N.W.2d 648 (Iowa 1983); *Bank of Kansas v. Hutchinson Health Servs., Inc.,* 12 Kan.App.2d 87, 735 P.2d 256 (1987); *Michigan Nat'l Bank v. Flowers Mobile Homes Sales, Inc.,* 26 N.C.App. 690, 217 S.E.2d 108 (1975); *Anderson, Clayton & Co. v. First American Bank,* 614 P.2d 1091 (Okla. 1980).

The Court has only found two cases to the contrary, but they were decided under a different code provision— § 9–306(4). *See In re Gibson Products of Arizona,* 543 F.2d 652 (9th Cir.1976); *Morrison Steel Co. v. Gurtman,* 113 N.J.Super. 474, 274 A.2d 306 (1971).

the transfer was not in the ordinary course of business. There was evidence that once the debtor in that case found out that the plaintiff had revoked the floor plan agreement, the debtor ran to the defendant bank and told its representative that he wanted defendant to be safe in its loan to the detriment of the plaintiff. Although the bank's representative suggested that the debtor just write the bank a check, the debtor insisted that the bank debit the account because it wanted to prevent the plaintiff from collecting on checks the debtor had written. The court found that this, combined with the bank's knowledge that the debtor had a floor plan arrangement with the plaintiff, and the debtor's insistence that this transaction take place after the bank was closed, was sufficient to put the bank on inquiry as to the possible trust character of the funds in the debtor's account. *Id.* at 325.

The Kentucky Supreme Court has apparently announced a bright-line rule that comment 2(c) does not apply when a bank seizes funds deposited in a customer's account and applies the funds to payments of overdrafts or antecedent debts. *See General Motors Acceptance Corporation v. Lincoln Nat'l Bank,* 18 S.W.3d 337, 340 (Ky.2000). At the extreme end of the spectrum, the Iowa Supreme Court held that comment 2(c) does not affect Article 9 priority rules. *See Linn Coop. Oil Co. v. Norwest Bank Marion, N.A.,* 444 N.W.2d 497, 499 (Iowa 1989). In the view of these courts, ruling in favor of banks in this situation would eviscerate a secured party's interests in collateral and allow a an unsecured bank to leapfrog secured creditors.

The sole Eighth Circuit opinion interpreting comment 2(c) supports GE Capital's position, but it is not squarely on point. In *Barber–Greene Co. v. National Bank of Minneapolis,* 816 F.2d 1267 (8th Cir.1987), the bank and the debtor had a financing arrangement similar to the present case. Like Union Planters, the bank in *Barber–Greene* gave the debtor a revolving line of credit, set up three bank accounts, but it didn't have an automatic sweeping arrangement where it paid down the line of credit. The bank setoff against the funds only when the debtor's financial condition worsened. *Id.* at 1269. With respect to comment 2(c) the court held that the comment "presupposes an account over which the debtor exercises control, into which the debtor voluntarily makes deposits, and from which the debtor voluntarily makes payments to third parties who take in good faith." *Id.* at 1272. The court noted that the debtor had no control over the collateral account; rather, the bank had sole control. The court further found that by applying the proceeds to the debtor's outstanding loan, the bank knowingly attempted to put itself in a better position than that of creditors like Barber–Greene who held superior claims to the proceeds. With that in mind, the court held that the principles set forth in Comment 2(c) were not intended to protect the bank in these circumstances. *Id.*

Some courts, however, have allowed banks to use comment 2(c) to take free of the security interest even if they knew about the secured party's interest. In *General Electric Co., Lighting Business Group v. Halmar Distributors, Inc. (In re Halmar Distributors, Inc.),* 116 B.R. 328 (Bankr.D.Mass.1990), the bank required the debtor's customers to mail the checks to a post office lockbox in the bank's control, and the debtor would endorse the checks to the bank, who would accordingly reduce the line of credit it gave the debtor. The bank took the checks-which were made payable to the debtor-and endorsed them over to itself. When a secured party sued the bank for conversion, the bank argued it was an ordinary course transfer

within comment 2(c), and the court agreed. *Id.* at 333–34. The court distinguished *Barber–Greene* because the bank there didn't sweep the funds until it was presented with conduct that amounted to conduct that amounted to foreclosure, and the debtor there didn't consent to the sweeping.[11]

The First Circuit held that banks in this situation should be able to use comment 2(c) to escape the security interest unless they acted fraudulently or clearly improperly in a commercial context in *Harley–Davidson Motor Co. v. Bank of New England–Old Colony*, 897 F.2d 611, 622 (1st Cir.1990). The bank there was a junior secured party to the debtor's used and new motorcycles, and it knew Harley–Davidson held a senior security interest in the bikes and their proceeds. The bank, however, required the debtor to give the bank the title documents to the bikes. When the debtor sold a bike, the bank forced the debtor to pay it back before it would relinquish the title documents. Although the First Circuit found that the district court improperly granted summary judgment to the bank on the plaintiff's proceeds conversion claim, it warned that if courts defined "ordinary course" too narrowly, parties like suppliers of gas and

electricity would be subject to conversion actions. The court further noted that there were good reasons not to impose on banks-even if they knew a secured party held a superior interest-the complicated burden of contacting numerous inventory financers to ask permission to take money from a debtor's commingled bank account. *Id.* It thus limited, on remand, the "improper" inquiry to the new motorcycles the bank did not finance.

The Seventh Circuit shared the concerns of the First Circuit in *J.I. Case Credit Corp. v. First Nat'l Bank of Madison County*, 991 F.2d 1272 (7th Cir.1993). Analogizing to UCC § 1–201(9) defining a "buyer in the ordinary course,"[12] the court ruled, applying Indiana law,[13] that a payment is within the ordinary course within the meaning of comment 2(c) if it was made in the operation of the debtor's business and if the payee did not know and was not reckless about whether the payment actually violated a third party's security interest. *Id.* at 1279. In that case the bank did not have a cash management system in place; instead the debtor chose to write checks to pay off the bank before the other secured party. With no evidence that the bank had any reason to suspect the debtor wasn't fulfilling its obligations

---

11. The court did not rely exclusively on comment 2(c) to rule for the bank. It also found that there was no security interest in those proceeds to begin with, because the proceeds were never "received by the debtor" as UCC § 9–306(2) requires; they were never deposited in the debtor's bank account.

12. One commentator has astutely observed that the Seventh Circuit's analogy to the Code's definition of "buyer in the ordinary course" is odd-first, because banks are not buying from someone in the business of selling the item bought, and second banks in these cases do not give new value. Both of these would prevent someone from being a "buyer in the ordinary cause." *See* Janet A. Flacus, *Banks Against Secured Parties: To the*

*Victor Go the Spoils*, 6 U. Miami. Bus. L.J. 59, 85–87 (1997).

13. The Indiana Supreme Court later declared that *J.I. Case* does not represent a correct statement of Indiana Law. *See HCC Credit Corp. v. Springs Valley Bank & Trust*, 712 N.E.2d 952, 957 (Ind.1999). As discussed later in this opinion, the Indiana Supreme Court held that whether a payment is in the ordinary course within the meaning of comment 2(c) is balancing test with two factors: (1) the extent to which the payment was made in the routine operation of the debtor's business; and (2) the extent to which the recipient was aware that it was acting to the prejudice of the secured party. *Id.*

to the other secured party, the court ruled in the bank's favor. *Id.* at 1280.

*Orix Credit Alliance, Inc. v. Sovran Bank, N.A.,* 4 F.3d 1262 (4th Cir.1993), which both parties discuss extensively, is as close factually to the present case as one can get. Orix was a secured inventory financer and the bank was both a lender and the depositary bank for the debtor. The bank, like Union Planters here, gave the debtor a revolving line of credit and three bank accounts. The bank also had an arrangement where, every day, it would sweep the funds from the debtor's main deposit account and pay down the line of credit. The bank also agreed to subordinate its interest in the crane-the collateral generating the cash proceeds at issue-to Orix, recognizing that Orix's security interest was superior. The debtor's financial condition worsened, and when its line of credit expired, it couldn't pay the balance it owed to the bank. Orix allowed the debtor to sell the crane, which it was leasing to a third party, on the condition that the debtor would use the proceeds to pay off Orix's loan. When the debtor deposited the proceeds, the bank swept the funds to pay off the line of credit, as it had always done. The debtor then tried to write a check to Orix to pay off that loan, and asked the bank to advance the money from the line of credit to cover it. When the bank was presented with the Orix check for payment, however, it dishonored it because the amount exceeded the remaining availability under the line of credit. Orix sued the bank, arguing that the bank had no right to sweep the proceeds

from the crane, because, under UCC § 9–306(2), Orix had a security interest in the proceeds. After the district court granted summary judgment to the bank, Orix appealed to the Fourth Circuit.

Although the court did not discuss the tracing issue, it did treat comment 2(c) to UCC § 9–306 extensively. Orix argued that the bank's "sweeping" could not be a transaction in the ordinary course of the debtor's business if the bank knew Orix had a security interest in the proceeds.[14] The court rejected this argument out of hand, relying on *Halmar* and *Harley–Davidson. Id.* at 1266–67. Next Orix argued that comment 2(c) should not apply because the debtor did not pay the proceeds to its bank in the operation of the debtor's business. Again, distinguishing *Barber–Greene,* the court rejected Orix's argument because the bank had offset against the accounts even when not faced with conduct amounting to foreclosure. *Id.* at 1267–68. In ruling for the bank, however, the court made no mention whatsoever of the subordination agreement between the Orix and the bank.

In dissent, however, Judge Ervin found that the subordination agreement was the most important part of the case. Recognizing that a subordination agreement binds the parties in a system of priorities outside the scope of Article 9 of the Uniform Commercial Code, he thought that comment 2(c) should not allow the bank to effectively renege on its contractual obligations to Orix to subordinate its interests in the collateral.[15] *Id.* at 1270–71.

---

**14.** The parties disputed whether the bank knew it swept proceeds in which Orix had a security interest, but the court assumed the bank did, because it was reviewing a grant of summary judgment in the bank's favor, and had to view the facts in the light most favorable to Orix. *Orix,* 4 F.3d 1262, 1266 n. 7.

**15.** Judge Ervin noted that the subordination agreement at issue was ambiguous because it was unclear whether it just covered the crane, or both the crane and its proceeds. He would, therefore, have remanded the case to the district court to interpret the agreement. He noted, however, that Orix should win if it was interpreted to cover proceeds, because

### (2) Conclusion

Although Union Planters argues that their subordination agreement is irrelevant to the outcome of this case, this Court strongly disagrees. There was no subordination agreement in all of the other cases that allowed banks in this situation to take free of the secured party's interest. The Fourth Circuit in *Orix* disregarded this aspect of the cases it relied on, and this Court feels the dissent there has the better reasoned argument. Indeed, the subordination agreement is the key that unlocks the mystery to this case. There is no ambiguity here about the scope of the subordination agreement-Union Planters expressly acknowledged that its interest was junior to GE Capital for a well-defined list of items, including the proceeds at issue. This Court does not believe that comment 2(c) to U.C.C. § 9–306 permits a party—who has bound himself contractually to subordinate his interest in collateral to another secured party-to defeat that secured party's contract right.

If the Court allowed Union Planters to take free of GE Capital's security interest here, it would send a message to inventory financers that they cannot rely on a subordination agreement from a bank who has a Cash Management System in place for their debtors. It is entirely implausible that Article 9 of the Uniform Commercial Code-a statutory scheme that was designed to promote the use of secured financing-supports a scenario where banks subordinate, but extinguish the superior security interest by paying themselves, thereby nullifying their own agreement's effect. Allowing this would encourage banks in this situation to knowingly defeat the rights of someone to whom they contractually gave a superior claim, a practice akin to that frowned upon by the Eighth Circuit in *Barber–Greene Co. v. National*

*Bank of Minneapolis,* 816 F.2d 1267 (8th Cir.1987). Union Planters insists that they never actually knew they were taking proceeds of GE Capital's collateral because GE Capital didn't force the debtor to segregate its funds. When, however, Union Planters gave up its rights to whatever GE Capital had, it should have been the party responsible for making sure that it did not violate its contractual obligations. GE Capital has proved all of the elements of conversion; with no genuine factual disputes to discuss, GE Capital is entitled to summary judgment on that claim.

### IV. Damages

■ Initially GE Capital asked the Court to appoint a special master to determine its damages in this case. Later it filed a partial summary judgment motion claiming it was entitled to $200,389.57 in damages. In its response challenging the damage amount of GE Capital's damages, it presented evidence that GE Capital may have made improper assumptions in calculating what deposits were actually made into the debtor's bank accounts, and in applying the lowest intermediate balance rule. The trial is the appropriate place to resolve these issues; the Court is not satisfied that GE Capital has met its summary judgment burden on the issue of the determination of damages.

### V. GE Capital's remaining counts

■ There remain counts for declaratory judgment, breach of the subordination agreement, tortious interference with contract, and unjust enrichment. The Court has granted GE Capital summary judgment on its conversion claim. GE Capital will be restored to its rightful position if and when it proves its damages. All of the other causes of action revolve around the

the subordination agreement would make Article 9 irrelevant. *Orix,* 4 F.3d at 1271.

same conduct, and are premised on the theory that Union Planters wrongfully took proceeds. Under any of GE Capital's theories, they would not be entitled to any more damages than the lowest intermediate balance proves to be due. Where a party's claims are simply alternative theories seeking relief for the same injury, that party is not entitled to a separate compensatory damage award under each legal theory. *Diversified Graphics, Ltd. v. Groves,* 868 F.2d 293, 295 (8th Cir.1989) (internal citations omitted). All other counts of GE Capital's complaint are thus dismissed with prejudice.

## VI. Conclusion

Having found no genuine issues on the issue of Union Planter's liability for conversion, the Court grants GE Capital summary judgment on that count, and the case will proceed to trial on the issue of damages.

Therefore,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment and for Appointment of a Special Master [doc. # 40] is **GRANTED** in part. The Court grants summary judgment on Plaintiff's conversion count, but will not appoint a special master.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment On Conversion Damages [doc. # 55] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [doc. # 56] is **DENIED.**

**IT IS FURTHER ORDERED** that all remaining counts of Plaintiff's complaint are **DISMISSED with prejudice.**

**IT IS FURTHER ORDERED** that the trial date of January 21, 2003 is vacated, and Plaintiff's damages shall be determined in a hearing on *February 10, 2003 at 8:30 a.m.*